807 A.2d 1141

**GLADWYNNE CONSTRUCTION COMPANY**

v.

**MAYOR AND CITY COUNCIL OF BALTIMORE.**

No. 2653 Sept. Term, 2000.

Court of Special Appeals of Maryland.

Sept. 25, 2002.

Andrew H. Vance (Hodges, Ulman, Pessin & Katz, P.A., on the brief), Towson, for appellant.

Timothy A. Dixon, Baltimore, for appellee.

Argued before HOLLANDER, KENNEY and DEBORAH S. EYLER, JJ.

HOLLANDER, Judge.

This case arises from a construction contract (the "Contract") between Gladwynne Construction Company ("Gladwynne"), appellant and cross-appellee, and the Mayor

and City Council of Baltimore (the "City"), appellee and cross-appellant. The Contract had a "base bid price" of $497,000, and involved the renovation of several classrooms and science laboratories (the "Project") at Polytechnic High School No. 403 (the "School" or "Poly"). For reasons that are in dispute, the completion of the work was delayed by almost a year.

On October 3, 1999, after the City failed to make full payment under the Contract, appellant filed suit in the Circuit Court for Baltimore City, seeking to recover damages of $244,638.14 for breach of contract, unjust enrichment, and quantum meruit. Appellant's claim for damages included extended field costs and home office overhead costs occasioned by the delay in completion of the Contract. The City counterclaimed, seeking $97,500 in liquidated damages because of the delay. Pursuant to a partial settlement between the parties concerning the direct costs for the City's change orders, the City paid appellant $104,422 on December 15, 2000. Thereafter, over the course of several days in December, the remaining issues were tried to the court.

When the trial concluded, the court indicated that it intended to award appellant the Contract retainage, in the amount of $25,753, as well as $66,083.55 for extended field costs due to the delay, conditioned on appellant's successful completion by January 16, 2001, of a punch list prepared by Poly's principal. At a subsequent hearing, the court concluded that appellant had failed to complete the punch list, and therefore it declined to award the Contract retainage. Instead, the court awarded appellant $66,083.55, for extended field costs for a period of 195 days, rather than the 309 days that appellant claimed. Moreover, the court declined to award any home office overhead expenses occasioned by the delay.

On appeal, Gladwynne presents several issues for our review, which we have reordered and rephrased:

I. Did the court err in failing to award any damages to Gladwynne for extended home office overhead?

II. Did the court err in failing to award damages to appellants for extended field costs through completion of the Project in January 1999?

III. Did the court err in deducting the Contract retainage from Gladwynne's award of damages?

In its cross-appeal, appellee presents two questions, which we have also reworded:

I. Did the trial judge err in awarding any damages to appellant?

II. Did appellant fail to comply with various provisions of the Contract?

For the reasons that follow, we shall affirm in part and vacate in part and remand for further proceedings.

### FACTUAL SUMMARY[1]

Gladwynne, a general contractor, submitted a bid to the City in March 1997, to do the renovation of several science laboratories and classrooms at Poly. The City awarded the contract to Gladwynne, and the parties entered into the Contract on or about August 1, 1997. The work was to commence on September 2, 1997, with completion to occur within 180 calendar days, i.e., February 28, 1998. As it turned out, construction was not completed until about 489 days after it began, and some 300 days after the original completion date. The parties stipulated that the Contract was substantially completed on September 11, 1998. Nevertheless, change orders continued until December 1998, and the work was not fully completed until on or about January 31, 1999. Neither the classrooms nor the laboratories that were subject to renovation were useable or used in the fall of 1998.

---

1. At trial, the parties presented testimony from numerous witnesses, including Thomas Behrle, appellant's president; Edwin Norman, an accountant employed by Hurtz, Bath & Company; Scott Sider, the Construction Contract Administrator who was an architect with Kann and Associates, Inc.; Linwood L. Jones, an inspector with the Baltimore City Department of Public Works; Gerald Weeks, an employee of the Department of Public Works; and Ian Cohen, the School principal.

Pursuant to the Contract and the Project drawings, Gladwynne was to replace the utility lines located in a hollow crawlspace under a concrete slab in Room 29 of the School. The lines were to service Room 29 and science laboratories two floors above. Appellant was also obligated to install new vinyl floors, lab casework,[2] plumbing, fixtures, lights, and heating and cooling equipment. Based on the Project drawings, appellant planned to replace the utility lines by drilling two four-inch holes into the concrete crawlspace and then working inside the crawlspace to insert new utility lines. Once the new utilities were in place, the four inch holes were to be patched.

Appellant was advised to begin performance of the Contract on September 2, 1997. However, neither appellant nor the City was ever able to locate the crawlspace. While Gladwynne searched for the crawlspace, it was unable to perform any of the work with regard to replacement of the utilities. Eventually, appellant had to alter its method for replacement of the utility lines. On October 27, 1998, Scott Sider, Construction Contract Administrator, wrote to Frederick Petrella, Jr., an employee in the Construction Division of the Department of Public Works, stating, in part:

We have reviewed the Contractor's Change Order Proposal for changing the plumbing in Rooms 29, 29A, and 29B from being in a crawl space [sic] (as indicated on the Drawings) to being buried in excavated trenches. This change order is required since the crawl space does not exist under those classrooms.

Appellant planned, instead, to break up the concrete slab in Room 29, dig a trench to hold new utilities, and then install them in poured concrete. The trenching work occurred in Rooms 29A, B, and C at Poly, and commenced on November 13, 1997.

---

2. As we noted, the original Contract price was $497,000. Of that sum, the cost of the casework accounted for $135,000.

According to appellant, when it undertook to perform the trenching work, further delays ensued. For example, while appellant was digging the trenches in the floor to run the utilities in Room 29, it severed existing cable lines submerged in the concrete, which had to be repaired. The tile flooring was also damaged from the trenching and had to be removed. When the existing tiles were removed, Gladwynne found asbestos, which also had to be removed. That process was not completed until March 1, 1998. By that date, Gladwynne had progressed to the point where it should have been on November 1, 1997. According to Gladwynne, it "was already 170 days into a 180 day contract."

As a consequence of the change in design, Gladwynne was unable to install the plastic utility pipes that it had already ordered and paid for, which were stored on site. Instead, appellant ordered a more durable utility pipe, known as Duriron, but had to wait until January 1998 for its arrival. In February 1998, after the trenching work was completed, and the new Duriron lines were installed, the trenches were filled with concrete. Rather than patching the four inch holes, as originally anticipated, Gladwynne had to smooth the surface of the entire floor of Room 29 to prepare it for the new vinyl floor.

In addition, the casework could not be installed until after the new floors were installed. In order to install fixtures, the casework had to be finished. Then, when Gladwynne discovered leaks in the laboratory windows, the City hired another contractor to do the repair work; that contractor was unsuccessful in stopping the leaks, and Gladwynne had to cease installation of the casework in July 1998, until the leaks were remedied.

In addition, appellant claimed that delays were occasioned by the architect, who continued to make changes in the work through December 1998, which adversely affected appellant's productivity. Appellant identified more than fifty changes to the construction plans made by the architect. For example, Gladwynne maintains that the architect failed to include gas

pipes to service the Bunsen burners in the laboratories, delaying the work that depended upon gas service. Design defects or changes also resulted in moving drain lines to avoid lights, constructing enclosures for pipes, adding electrical lines and lights, and adding electronic controls for the heating and cooling systems. According to appellant, unforeseen problems and changes extended the job and caused Gladwynne to incur additional field and home office expenses.

Gladwynne conceded that the Project was almost finished in November 1998, when Thomas Behrle, its president, began work on a project for the Corps of Engineers. Nevertheless, Gladwynne continued to work on the Project through January 1999.

Gladwynne disputed the alleged percentage of completion specified in the progress meeting notes on which the City relied. Gerald Weeks, Chief of the Construction Management Division in the Bureau of General Services, Department of Public Works, acknowledged that the 91.6% completion figure in the Contractor's Current Estimate for May 1998, pertained only to the original Contract, exclusive of change orders, and included the purchase of $135,000 in casework material, which was on site but not yet installed.

Similarly, the 93% completion figure in the progress meeting notes of May 5, 1998, pertained only to the original Contract work, exclusive of change orders. Nevertheless, relying on the progress meeting notes of May 5, 1998, Weeks maintained the Project was 93% complete at that time. He was of the view that appellant should have been able to complete the remaining 7% of the Project in the ensuing three weeks.

Accordingly, the City compensated appellant through May 1998 for its direct costs. As it turned out, appellant did not achieve substantial completion until September 11, 1998. Moreover, the last change order was not issued until December 1998.

The progress meeting notes of May 5, 1998 stated, in part:

Notice to Proceed: September 15, 1997
Completion Date: March 15, 1998
Contract Days: 180
Days Remaining: −51
Percentage of Completion: 93%

Outstanding Change Orders Still Outstanding

A. Floor penetration and repairs in lieu of
 coredrilling submitted

B. Add plumbing and electrical service to
 9B, 29C, 163, 232, 138, 183B

C. Sawcut and re-pour plumbing trenches
 in 29. submitted

D. New plumbing layout in 29, 29A, 29B. submitted

E. New floor penetrations for ductwork to
 miss cables. submitted

F. Add gas service to 29B, 29C, 139, 232,
 163B. submitted

G. Demo slab under platform in 163.
 Level floor. submitted

H. Remove cabinet and revise plumbing
 due to CMU wad in 124

I. Move drain line in 124

J. 29A leaking faucets

K. Refrigerator and DW-hook up only

Old Business

Cabinets being installed
DW and Refrigerators on site

The change order proposal of September 2, 1998 said in part:

demo fancoil unit in 29
connect new fancoil unit
supplied by city (patterson)

The notes also stated: "Additional contract time will be required total 3 days." In response, Kann and Associates,

Inc., the architectural firm for the Project, stated that the "work was required to replace an existing malfunctioning unit . . . .", but that "the Contractor's Change Order Proposal is not reasonable and should be revised and resubmitted. . . ."

Appellant submitted in evidence proposed change orders dated August 18, 1998, September 2, 1998, and December 7, 1998. The change order of December 7, 1998 said, "new compressed air main due to poor condition of the existing lines." Further, it indicated: "Additional contract time will be required total 10 days." In response, Sider, the Project architect, agreed with the request, stating: "This change order is required. . . ." He added that the "proposed cost values are reasonable and should be accepted. . . ."

The following testimony of Behrle is also relevant:

[APPELLANT'S COUNSEL]: Mr. Weeks testified with regards to Defendant's Exhibit 2, which is an April of '98, Contractor's Current Estimate, that Gladwynne was 91.6 percent complete. Do you recall that testimony?

[BEHRLE]: Yes.

[APPELLANT'S COUNSEL]: Okay. Were there any change-orders included in that amount?

[BEHRLE]: No.

[APPELLANT'S COUNSEL]: All right. Now, Defendant's 3. Before you turn to Defendant's 3, let me ask you about drilling for the case work [sic]. That's $135,000.00 that you billed for in April and you hadn't put a thing in yet. Is that correct?

[BEHRLE]: That's [$]127,500.

[APPELLANT'S COUNSEL]: Okay.

[BEHRLE]: And we had not installed any.

[APPELLANT'S COUNSEL]: Had not installed any. Now, you're actually billing for it before it's installed.

[BEHRLE]: Yes.

[APPELLANT'S COUNSEL]: Why is that? . . . .

[BEHRLE]: Well, it's normal procedure.

[APPELLANT'S COUNSEL]: All right. Now, turn, please, to Defendant's Exhibit 3, the progress meeting. Do you see that?

[BEHRLE]: Yes.

[APPELLANT'S COUNSEL]: Now, Mr. Weeks testified that the 95 percent completion that's listed there includes all change-orders. Do you agree with that?

[BEHRLE]: No.

[APPELLANT'S COUNSEL]: Why not?

\* \* \*

[BEHRLE]: It says 95. If you look at Item One, the outstanding change orders, they're still outstanding. They've been submitted. We have received none of them. So, we've received no change orders and no time, so it can't possibly account for the change orders.

\* \* \*

[APPELLANT'S COUNSEL]: So, 11 of the change orders are in—

[BEHRLE]: Yes.

\* \* \*

[APPELLANT'S COUNSEL]: But none have been issued?

[BEHRLE]: That's correct. None have been issued.

[APPELLANT'S COUNSEL]: Now can you explain to the court why your office generated a document stating that you were 93 percent complete?

[BEHRLE]: Again, it does not take into account the change orders, and it's counting for the fact that there are stored materials, 29 percent of that April invoice, Exhibit 2, 28 percent is the cabinets. If you take 91 from 28, we can all do the math. Well, it's 63 percent complete besides the cabinets.

On October 14, 1998, the Construction Management Division filed a Report of Unsatisfactory Contractor Performance (the "Report"), citing problems in the areas of workmanship; manpower and equipment; supervision; management of subcon-

tractors; prompt and adequate clean-up of work areas; and cooperation with other contractors, architects, and City personnel. Moreover, Poly's principal, Ian Cohen, blamed Gladwynne for the delays and for various construction problems. He testified, in part:

[COURT]: ... Can you give me some idea of how the work was flowing on a day to day basis from the time that the work was started until the time that it stopped?

[COHEN]: As I mentioned and from naive perspective and certainly that is not my expertise in construction management.... And so my sense of it is it was like fits and starts. That's why I said before it was all hurry up and wait.

[COURT]: Tell me what that means?

[COHEN]: Days when there were be [sic] a number of workmen in the building. And days when there would be nobody. And as I would hear things like well, we might not be coming back 'cause we're not getting paid.[']

\* \* \*

[COURT] Do you know the difference between Mr. Burrow and his people, and those that would be considered by others to be subcontractors. Did ... you ever know who his people were?

[COHEN]: I can't say that I knew whether any individual would have been a subcontractor or a representative of Gladwynne.

[COURT]: Okay. Okay. Did ever somebody be [sic] there when there was not this hurry up going on in between? Were there people there working with Mr. Burrow the days that he was there, working directly with him?

[COHEN]: I can't say that—I can't answer that.

According to the City, the number of superintendents on the job contributed to the delay in completion of the Project. Behrle acknowledged that there were at least four different superintendents, which he admitted was unusual, given that the Project was only supposed to last 180 days. He also acknowledged that he only had a superintendent on the site ninety-five percent of the time. As of November 1998, when

Behrle began to work at another project, no superintendent was at the School.

Behrle testified that there were no valid punch list items outstanding, and claimed the City was seeking performance of work by appellant that was beyond the scope of the Contract. Nevertheless, after the City rested, the court ordered Cohen to create a written list of problems that he had with Gladwynne's work, so that any incomplete items could be addressed. In response to the court's directive, Cohen prepared a memorandum dated December 22, 2000, listing the following problems as unresolved:

*Room 163*

— Faulty electrical outlet on new hood
— Faulty electrical outlet along the side of the hood (near door)

*Room 29*

— 4 faulty electrical outlets

*Room 230*

— 2 faulty electrical outlets
— leaking faucet
— severed electric lines running to the spotlights

With respect to field costs, appellant claimed delay damages for 309 days, totaling $149,247. Appellant calculated the extended home office overhead costs allocable to the Project using the so called *Eichleay* formula.[3] Exclusive of officers' salaries, appellant relied on a rate of $227 per day for 309 days, for a total of $70,143. Appellant has adjusted its claim to recover overhead for 245 days, at a rate inclusive of officers' salaries.

As the City concedes in its brief, "there were delays in the early stages of the project," for which appellant was not responsible. Nevertheless, Weeks testified that appellant should have completed the Project by May 30, 1998. There-

---

**3.** The *Eichleay* formula is a method of calculating a daily rate for home overhead costs and is discussed in detail, *infra.*

fore, the City granted appellant an extension of performance of only ninety-one days.

In court on January 3, 2001, the court set forth its "temporary understanding" of its "decision." It indicated that it intended to enter judgment in favor of appellant in the amount of $91,836, conditioned on Gladwynne's prompt and satisfactory completion of a punch list prepared by the School's principal. If appellant failed to complete the punch list, however, the court said appellant would forfeit the Contract retainage of $25,754. The following colloquy is relevant:

> THE COURT: [I]t is the intent of the court … to recognize the $25,753.00 is outstanding to plaintiff from the contract itself. … [B]oth parties acknowledge that there's a punch list of items that need to be done, and that it is the court's intention that if the punch list items are not done within 10 days of today's date, each and every item to the satisfaction of defendant's representative, i.e., Director, Mr. Cohen, as Director of the School, a third party beneficiary of the contract, is that the court will deem that it takes $25,753.00 of offset to complete those items.

> I would assume … that [appellant] would rather complete the punch list themselves. Otherwise, I can give my decision today.

> [APPELLANT'S COUNSEL]: … Your Honor, we would need to discuss [this] with our subcontractors. …

In effect, the court presented appellant with the proverbial Hobson's choice. It said:

> [THE COURT]: The bottom line is, is that you could object now and say, I don't want to do it, and I'll make my ruling, and my ruling will be, is that I'm offsetting [$]25,753 as the amount that's needed to do the punch list.

Gladwynne's attorney responded:

> [APPELLANT'S ATTORNEY]: We'll address the punch list.

Regarding timeliness of completion, the court stated:

[THE COURT]: The base contract ... has a completion date of February 28th, which would be the 180th day. It is uncontradicted that certain things did, in fact, affect that [completion] date, most notably would be the crawl space in question, the trenching that needed to be done, and the asbestos tiles that needed to be dealt with. There is no question that it impacted the dates and times. And for any suggestion otherwise is an absurdity.

While, in fact, there was a negotiation, if you will, of the change orders, between plaintiffs and a representative of the defendant, i.e., Mr. Weeks as I understand it, there is a dispute as to the amount of days that would have taken for the change-orders to have been done.

The court determined that it was reasonable for appellant to seek an extension of time under the Contract through September 11, 1998. It reasoned:

What has happened is, is that both parties began to, in testimony, refer to September 11th, 1998 as the substantial completion date. Although there was discussion by the defendants as to adjustments, et cetera, and the court finds that, in fact, while there were discussions of activity after the September 11th date, the question of whether or not a party was, in fact, present or workers present on all of the days, what is clear here is, is a substantial portion of the actual contract was to be done by subcontractors, and the coordination of such.

It is clear from the evidence is that the superintendent was not on the job daily nor expected to be on the job daily. What is clear here is there's a question of who the Project Manager was, and whether or not the Project Managers were, in fact, on the job daily even if there are payments being made to persons.

The court, for the purposes of adjusting all the facts, circumstances and evidence before the court, feels compelled to give an extension of the time to plaintiff, and does do so up to and including September 11th, 1998 as the adjustment date, if you will. The court takes that as an

extension of 195 days to the base contract, if you will, of the time.[1]

The court awarded extended field costs, calculated by using the daily general conditions rate of $338.89 per day that the City had proposed, and then multiplying that rate by the extended performance period of 195 days. The court did not award damages, however, for extended home office overhead costs, because the court determined that, as to the *Eichleay* formula, "all of the elements [were] not present and shown." It reasoned:

The court agrees with defendant that the only figure that makes sense to the court is the base, the original contract, that it's untainted, if you will, as to the method of getting to dollars and cents or figures. By that I mean, is that the court is again disturbed by the suggestion of plaintiff in its testimony that, in fact, this $120,000.00 for the superintendent is just thrown in there.[5] And how we get up the 500 and some odd dollars per day, et cetera, just boggles my mind to even think that it should be even suggested to a court, and doesn't think that it would shock the court in a negative manner, I can't explain.

But that isn't the purpose here. I've made my point. Is that in the original contract itself it gave $61,000.00 as the general conditions as such, and it is reasonable to assume is that the general conditions, as such, if extended in terms of time, is that the general conditions is a way of measuring that which the overhead and expenses of plaintiff, dividing that original amount of [$]61,000 by 180 days, which was that of the original contract, one then finds $338.89 per day.

The court therefore looked at August 11th, '98, which was said to be 98 percent completion, but I will tell you that that was the intent of the court to use the August 11th date but

---

4. The 195 days represented the period from February 28, 1998 to September 11, 1998.

5. Behrle testified that the Project Manager earned $120,000 a year.

for the discussion of both parties of the September 11th date as substantial completion date, as such.

Therefore, from February 28th to September, February 28th to September 11th, 1998, is 195 days. 195 times 338.89 is $66,083.55. Assuming that the punch list items are completed within 10 days, the court will grant $25,753.00 as the balance of the contract.

The Court concluded:

It is the intention of this court therefore based on all that's before the court, is to grant judgment in favor of plaintiff in the amount of $91,836.55. If plaintiff fails to comply with the agreement on today's date of rendering the existing punch list items, as an amount at issue, then the amount is to be $66,083.55.

Accordingly, the court continued the matter until January 16, 2001, while Gladwynne undertook to perform the punch list work specified by Cohen. When the parties returned to court on January 16, the City claimed that the punch list was not satisfactorily completed. Gladwynne's counsel disagreed, and suggested that all the items on the list were not within the scope of the Contract. Appellee's attorney responded that the "appropriate time to object to items on the punch list" was at trial.

The court allowed the City to establish appellant's unsatisfactory performance by proffer. The following colloquy is relevant:

[APPELLEE'S COUNSEL]: Your Honor, if called to testify we have three individuals from, two from SIDHU Associates [an engineering consulting firm] and one from the architect. The mechanical engineer would testify that of the mechanical engineering items, the mechanical items on the punch list as contained in Defendant's Exhibit 8; ten percent of the mechanical items have been completed.

As far as the electrical work is concerned thirty to forty percent of the punch list items have been completed.

And as far as the architectural matters; forty percent have been completed.

Mr. Cohen, if called to testify would state that he is totally unsatisfied with the completion of the punch list items.

Additionally, the court allowed the City to read into the record a memorandum from Cohen, dated January 12, 2001, expressing his dissatisfaction with Gladwynne's performance. He said:

Based on Mr. Burrow's statements during the walk through on January 4; we'll decide which items that we are going to do. The fact that he didn't even stay for the entire walk through. The fact that in meeting at the school on January 10th he asked me if there was some punch list items that the school would accept a small fee for in leu [sic] of the work being done. And his consistency in making excuses for the undone items saying that they couldn't be completed. I am certain that he never had the intention of completing the punch-list to our satisfaction.

Indeed, as today's walk through revealed, much of the work remains undone or has been done in extremely shoddy and slip shod fashion with potential hazards to students in some cases. This is an unacceptable and inexcusable situation.

In addition, I believe that it is important to add to the record that the items that [the court] wished me to list as incomplete. Which I faxed to you just before our winter break; were not all completed contrary to what Mr. Burrow stated on January 3.

Therefore, I am asking you to report to [the judge] per his request that for the above reasons the school remains deeply troubled and unsatisfied with the unresolved situation.

I believe strongly that the judge's decision on January 3 to hold back the stipulated sum [if] the punch list items remain incomplete should be implemented in its entirety....

In response, the following dialogue is pertinent:

[APPELLANT'S ATTORNEY]: Your Honor, this is the first that we have heard that Mr. Cohen's list, the items that

were on that list were never completed, that was never conveyed.

[THE COURT]: If you were communicating with Mr. Cohen on January 15th—

[APPELLANT'S ATTORNEY]: We were—

[THE COURT]:—I am assuming that he would have said the same thing to you and your client.

[APPELLANT'S ATTORNEY]: He did not.

[THE COURT]: I do not understand.

[APPELLANT'S ATTORNEY]: I have a proffer.

[THE COURT]: Did you speak with Mr. Cohen on January 15th?

[APPELLANT'S ATTORNEY]: I did not, Mr. Burrow spoke with him.

[THE COURT]: Then my concern is that if he spoke with Mr. Cohen on January 15th there is nothing before this court that would question the credibility of Mr. Cohen, sir.

Now, if you have something to bring to this court's attention as to why Mr. Cohen's word should be doubted and would not have been the same on the 15th. And that this court left its chambers after five o'clock on January 15th and heard not from you or your client then I am confused.

[APPELLANT'S ATTORNEY]: *I cannot cross examine a proffer, but I do have Mr. Burrow who—*

[THE COURT]: You can proffer whatever you want.

(Emphasis added).

Appellant's attorney "thoroughly disagree[d]" with the percentages of completed work. He also reviewed various disputed items for each room at Poly subject to the Contract. Appellant's attorney said:

Mr. Cohen's lack of satisfaction is simply based on the fact that he is getting information from SIDHU. SIDHU was never [sic], never participated with any walk through with us to generate the punch list. SIDHU never partici-

pated in any of the change orders that created for deducted work.

Your Honor, I have a list right here of the work that was accomplished. Of the [$]25,000.00 that is being withheld we estimate that less than [$]2,000.00 of work remains.

Nevertheless, claiming that the "items have not been completed as ordered by this court," the City urged the court to deduct $25,753 from Gladwynne's award. The court agreed with the City and declined to award appellant the retainage of $25,753. Instead, it entered judgment for appellant only for field-related delay damages, in the amount of $66,083.55, rather than the sum of $91,836.55 that the court had contemplated on January 2, 2001. The court reasoned:

... Plaintiffs has [sic] attempted to make arguments as to calculations and figures and Plaintiffs [sic] credibility in so doing is at the point of that the court cannot rely upon the information received from Plaintiff's [sic].

And, so, therefore the court has disregarded in total that which is suggested as a method of calculation or the actual calculations made by Plaintiff or his counsel.

Most specifically the suggestion that a punch list should be valued at two thousand dollars is only an example of the manner in which Plaintiff has approached the discussion in this court and the introduction [of] evidence. The method of its argument suggest [sic] not as to a reasonable interpretation of the facts, but that which is a misinterpretation of the facts.

Further, what the court could have done reasonably in this case. Could have stated that it agreed with Plaintiff and based on the evidence introduced by Plaintiff could have stated specifically that Plaintiff's exhibit was is [sic] that the amount of additional time should be at 141 days. And that Mr. Weeks had given credit in his mind of 76 of those days at the time [sic] discussion.

A list of those items that were considered as additional items and for payment were submitted to Mr. Weeks. Mr. Weeks stated 76 days [sic] allowed.

Plaintiff specifically only asked for 141 days. While, in fact, the 76 days were not added onto in terms of calculation. But if the court took Plaintiff's calculation of 141 days; the court has already stated as to why the amount is [$]338.89 per day rather the [sic] five hundred and some odd dollars suggested by Plaintiff itself.

However, that calculation alone would have suggested that the judgment should be in the amount of [$]47,783.49.

* * *

I will repeat that the intended beneficiaries of the contract were the children, the students of Baltimore Polytechnic Institute. To disrupt that school in the main areas of its education and its students. And to go more than a year beyond the intended date of completion is indefensible professionally, it is indefensible professionally.

Now, if you are listening to lawyers and not writing letters, that's Plaintiffs [sic] problem. And I am holding Defendants to the same standard that someone should have done something. And that is the only reason that the indication is not zero.

Because the court cannot rely on the calculations and the evaluations of Plaintiff. And the clear indication that it meant to and intended to mislead the court. The court cannot do anything but conclude that that which was the retainage for the amount for the remaining work should be retained and the work should be done by someone else. Based on the evidence as such is that the court will not retract from its basis in granting judgment in the amount of [$]47,783.49. But the court does go back to the calculations and saying that in fact, the court have [sic], if argued by defendant used 164 days. But because defendants also used the same date of substantial completion as Plaintiff's [sic] the court made the calculation to be 195 days. Because of the amount of general conditions in the actual contract is that the court came to the conclusion of the daily amount of [$]338.89.

Let me restate is that Defendant's evaluation of the situation based on contract could have warranted a total decision on behalf of defendant but for that which was his client. And the testimony would suggest that they capitulated in part to Plaintiff's inactivity. There is no suggestion here that he had enough people to do the job.

\* \* \*

[T]herefore, the Court finds in favor of Plaintiff, judgment in favor of plaintiff in the amount of [$]66,083.55. So ordered.

We shall include additional facts in our discussion.

## STANDARD OF REVIEW

When, as here, an action is tried without a jury, we review the case on both the law and the facts. The clearly erroneous standard governs our review of the court's factual findings. *Gwynn v. Oursler,* 122 Md.App. 493, 502, 712 A.2d 1072, *cert. denied,* 351 Md. 662, 719 A.2d 1262 (1998); *Barnes v. Children's Hosp.,* 109 Md.App. 543, 552–53, 675 A.2d 558 (1996); Md. Rule 8–131(c); *see Porter v. Schaffer,* 126 Md.App. 237, 259, 728 A.2d 755, *cert. denied,* 355 Md. 613, 735 A.2d 1107 (1999). Our role is not to determine whether we would have reached different factual conclusions than the trial court, or to substitute our judgment for that of the fact finder. *Barnes,* 109 Md.App. at 553, 675 A.2d 558; *Mercedes–Benz v. Garten,* 94 Md.App. 547, 556, 618 A.2d 233 (1993). Rather, "[i]f there is any competent, material evidence to support the trial court's factual findings, then we cannot set them aside as 'clearly erroneous,' even if we might have found otherwise." *Barnes,* 109 Md.App. at 553, 675 A.2d 558. Moreover, we review the evidence produced at trial in the light most favorable to the prevailing party. *Murphy v. 24th Street Cadillac Corp.,* 353 Md. 480, 497, 727 A.2d 915 (1999). We also assume the truth of the evidence presented, and all favorable inferences that can be inferred therefrom. *Id.*

In reviewing a trial court's conclusions of law, however, we do not apply the clearly erroneous standard. *Heat & Power*

*Corp. v. Air Products & Chemicals, Inc.,* 320 Md. 584, 591, 578 A.2d 1202 (1990). Instead, our review is more expansive. *Narayen v. Bailey,* 130 Md.App. 458, 461–62, 747 A.2d 195 (2000). We review *de novo* the trial court's legal interpretations and conclusions of law, without any deference. *Porter,* 126 Md.App. at 259, 728 A.2d 755. Our purpose is to determine whether the trial court was legally correct. *Gregg Neck Yacht Club, Inc. v. County Comm'rs. of Kent County,* 137 Md.App. 732, 752, 769 A.2d 982 (2001).

## DISCUSSION

### I.

■ Appellant contends that it was entitled to recover damages for extended home office overhead costs for 245 days, representing the period from March 1, 1998 (the day after the original Contract completion date) through November 1, 1998. Gladwynne complains, however, because the court failed to award any delay damages for home office overhead expenses. According to appellant, exclusive of officers' salaries, the Project generated daily overhead costs of $227. On that basis, the overhead delay damages would total $55,615. Inclusive of officers' salaries, the home office expenses generated a daily rate of $435.[6] For 245 days, the claim amounts to $106,575.

Although the City concedes that at least some delay was chargeable to the City, it contends that appellant failed to establish its claim for overhead damages under the *Eichleay* formula. The court clearly believed that some delay was attributable to the City, because it awarded delay damages for

---

6. Appellant explains: "Gladwynne placed its officers' salaries ($232,-252) in its field costs and deducted those costs from its home office overhead pool. The net result was that Gladwynne did not seek to recover Mr. Behrle's salary in its Eichleay calculations. Of course, when [the court] did not award Gladwynne its actual field costs, and refused to award any home office costs, Gladwynne's officers salaries were completely lost."

extended field costs, based on a finding of delay of 195 days.[7] Nevertheless, the court did not allow any delay damages for overhead, ruling "that Ikely [sic] as a formula does not apply in this case based on the contract, circumstances and factors of evidence that were submitted in this case." The court did not specify, however, which particular element of the *Eichleay* formula was not satisfied.

In *Dewey Jordan, Inc. v. The Maryland–National Capital Park and Planning Comm'n.*, 258 Md. 490, 498, 265 A.2d 892 (1970), the Court of Appeals recognized that a "contractor is entitled to be compensated for delays in work occasioned by faulty plans and specifications." There, the contractor filed a breach of contract action arising from the suspension of construction on a project because of defective plans and specifications. The contractor sought damages for its costs during a one month "shutdown" that was "due to no fault of its own." *Id.* at 493, 265 A.2d 892. The Court ruled that the contractor was entitled to recover damages for the delay in execution of the contract, stating, at 258 Md. at 498, 265 A.2d 892:

> [T]he contracting authority impliedly warrants that the plans and specifications are adequate and sufficient for the purpose intended and that the contractor is entitled to be compensated for delays in work occasioned by faulty plans and specifications.

The *Eichleay* formula was not at issue in *Dewey*, however. Moreover, although this Court upheld the trial court's use of the formula in *General Federal Constr., Inc. v. D.R. Thomas, Inc.*, 52 Md.App. 700, 451 A.2d 1250 (1982), the formula itself was not at issue, because the defense did not object to the evidence presented at trial as to overhead. Consequently, the Court observed that the appellants could not complain about it. *Id.* at 707–08, 451 A.2d 1250.

---

7. We shall discuss, *infra*, the question of the length of delay in the context of appellant's claim for damages for extended field costs.

We have not uncovered a reported Maryland case that has expressly adopted the *Eichleay* formula. Regardless of the particular overhead rate or the actual length of delay, our resolution of the claim for damages for extended overhead requires us to consider the *Eichleay* formula.

The *Eichleay* formula derives from a case heard by the Armed Services Board of Contract Appeals, captioned *Appeal of Eichleay Corp.* (1960), ASBCA No. 5183, 1960 WL 538. It concerns "home office overhead" costs, which are " 'those costs which are expended for the benefit of the business as a whole and which usually accrue over time.' " *Wickham Contracting Co., Inc. v. Fischer,* 12 F.3d 1574, 1578 (Fed.Cir.1994) (citation omitted). Home office costs are indirect expenses that "cannot be traced to any particular contract." *Id.* Generally, overhead costs "benefit and are caused by the business as a whole, not any one project." *Id.* at 1578. Moreover, "[u]nlike direct costs which are incurred only because of a particular contract, overhead costs are incurred even if the contractor had not undertaken a particular project." *Id.* at 1579.

The *Eichleay* formula " 'is the most well known formula for calculating unabsorbed overhead' costs arising out of government-caused delay." *Complete General Constr. Co. v. Ohio Dep't of Transp.,* 94 Ohio St.3d 54, 760 N.E.2d 364, 367 (2002) (citation omitted). Ordinarily, overhead costs subject to the *Eichleay* formula include items such as administrative and officers' salaries, rent, payroll, taxes, insurance, depreciation, dues, office expenses, utilities, cleaning, travel, and telephone expenses. *Wickham,* 12 F.3d at 1576; *C.B.C. Enterprises, Inc. v. United States,* 978 F.2d 669, 672 (Fed.Cir.1992). The formula, which computes a "constructive daily rate . . . ," *id.,* is as follows:

1. Contract billings/Total billings for contract period × Total overhead for contract period = Overhead allocable to the contract

2. Allocable contract overhead/Days of performance = Daily contract overhead

3. Daily contract overhead × No. of Days of Delay = Amount recoverable

*Capital Elec. Co. v. United States,* 729 F.2d 743, 747 (Fed.Cir. 1984); *see C.B.C.,* 978 F.2d at 673.[8]

■■■ In general, the *Eichleay* formula applies when a contractor "incurs extended overhead expenses as a result of *government-caused* delay...." *C.B.C.,* 978 F.2d at 671. It "is used to determine a government contractor's damages" with respect to "unabsorbed home office overhead when the government delays work on the contract indefinitely but requires the contractor to remain available to resume work immediately on the government's instruction." *Satellite Elec. Co. v. Dalton,* 105 F.3d 1418, 1419 (Fed.Cir.1997); *see Wickham,* 12 F.3d at 1577 (stating that the *Eichleay* formula is used "when disruption, delay or suspension caused by the government has made uncertain the length of the performance period of the contract"). Conversely, a claim for overhead is not compensable when the delay does not preclude the contractor "from taking on additional work or reallocating its resources." *Satellite,* 105 F.3d at 1420.

The underlying rationale of the *Eichleay* formula was elucidated in *Wickham,* 12 F.3d at 1577–78. There, the court said:

Suspension or delay of contract performance results in interruption or reduction of the contractor's stream of income from payments for direct costs incurred. This in turn causes an interruption or reduction in payments for overhead, derived as a percentage of direct costs, which is set by the contract. Home office overhead costs continue to ac-

---

8. According to appellant, exclusive of officers' salaries, application of the *Eichleay* formula in this case results in the following:

Corporate Overhead Allocable to Project
= $\dfrac{\$\ 497{,}000}{\$3{,}081{,}526} \times \$253{,}523 = \$40{,}889$

Daily Corporate Overhead Allocable to Project
= $\dfrac{\$\ 40{,}889}{180\ \text{days}} = \$227$

crue during such periods, however, regardless of direct contract activity. Consequently, this decrease in payments for direct costs creates unabsorbed overhead, unless home office workers are laid off or given additional work during such suspension or delay periods. When the period of delay is uncertain and the contractor is required by the government to remain ready to resume performance on short notice (referred to as "standby"), the contractor is effectively prohibited from making reductions in home office staff or facilities or by taking of additional work. Other reasons such as exhaustion of bonding capacity may also preclude additional contracts.

(Internal citations omitted).

In order for a contractor to recover under the *Eichleay* formula, three elements must be satisfied: (1) the plaintiff must prove that the contract was suspended, delayed, or disrupted by the government; (2) the plaintiff must prove that he/it was forced to "stand by" during the delay; (3) the plaintiff must prove that, while "standing by" during the suspension, delay, or disruption, he/it was unable to take on other work. *Satellite*, 105 F.3d at 1421; *Altmayer v. Johnson*, 79 F.3d 1129, 1133 (Fed.Cir.1996); *Interstate Gen. Gov't. Contractors v. West*, 12 F.3d 1053, 1056 (Fed.Cir.1993). When the contractor establishes a *prima facie* case of entitlement to use the formula, the burden of production as to the third element shifts to the government. *Satellite*, 105 F.3d at 1421; *Mech–Con Corp. v. West*, 61 F.3d 883, 886 (Fed.Cir.1995). At that point, the government must present "rebuttal evidence or argument" to demonstrate that the contractor did not suffer any loss "because it was able to either reduce its overhead or take on other work during the delay." *Mech–Con*, 61 F.3d at 886.

As the court said in *Satellite*, 105 F.3d at 1421, "The Eichleay formula compensates contractors who are unable to take on replacement work because the standby status prevents the contractor from doing so." *See also Interstate*, 12 F.3d at 1057–58. Although the standby status must be attrib-

utable to the government, *see Nebraska Pub. Power Dist. v. Austin Power, Inc.*, 773 F.2d 960, 972 (8th Cir.1985), the "standby test does not require that the contractor's work force be idle." *Altmayer*, 79 F.3d at 1134. Nor must the work be entirely suspended. *Id.* A contractor may be unable to take on additional work if the owner causes delay of uncertain duration or the contractor's bonding capacity is limited. *Wickham*, 12 F.3d at 1577–1578. Nor is recovery "compromised" merely because the contractor continues "to perform minor tasks throughout the period. . . ." *Altmayer*, 79 F.3d at 1134.

The Court recognized in *C.B.C.* that "contractors have been permitted to use [the Eichleay formula] to calculate extended home office overhead in situations where disruption, delay or outright suspension have cast a cloud of uncertainty over the length of the performance period of the contract." 978 F.2d at 672. The *C.B.C.* Court added: "The *raison d'etre* of Eichleay requires at least some element of uncertainty arising from suspension, disruption or delay of contract performance. Such delays are sudden, sporadic and of uncertain duration. As a result, it is impractical for the contractor to take on other work during these delays." *Id.* at 675.

 To be sure, the formula was developed "to provide a fair method for allocating home office overhead costs, otherwise inallocable, to specific contracts." *Wickham*, 12 F.3d at 1578. Although "a precise method for allocating overhead to specific contracts cannot be devised . . . the Eichleay formula provides a feasible, equitable and predictable method of compensating a contractor for unabsorbed overhead." *Id.* at 1581. Nevertheless, overhead costs are not "automatically" recoverable merely because a project is delayed. *W.G. Cornell Co. v. Ceramic Coating Co.*, 626 F.2d 990 (D.C.Cir.1980). To the contrary, "[w]here no element of uncertainty is imposed on the contractor, use of the Eichleay formula . . . is not permissible." *C.B.C.*, 978 F.2d at 675. *See, e.g., Weaver–Bailey Contractors, Inc. v. United States*, 19 Cl.Ct. 474, 476–77 (1990). Moreover, the formula does not apply to "mere exten-

sions of contract performance occasioned by contract modifications adding work to be performed." *C.B.C.*, 978 F.2d at 671. Accordingly, a negotiated change order extending contract performance is not usually within the ambit of *Eichleay*. *Id.* at 675.

 Assuming the prerequisites for the formula are met, the *Eichleay* formula is regarded by the Federal Circuit as "the exclusive means for compensating a contractor" for overhead expenses. *Wickham*, 12 F.3d at 1580–81. Indeed, the Federal Circuit has pronounced that "it is the only proper method of calculating unabsorbed home office overhead. No other formula may be used." *Id.* at 1575. Nevertheless, the computation of extended home office overhead using an estimated daily rate is an unusual remedy, *C.B.C.*, 978 F.2d at 675, and the decision as to whether the *Eichleay* formula applies is a question of law. *Nicon, Inc. v. United States*, 51 Fed.Cl. 324, 326 (2001).

As we noted, appellant complained about delays due to defects in the Project design and drawings. It also argued that the architect continued to issue change orders through December 1998, and appellant "could not determine when the job would be complete until the final change order was issued." In addition, appellant insisted that it was "unable to take on additional work to replace this Project due to bonding restrictions," which were not "eased" until November 1998. In its brief, Gladwynne asserts:

> There is no way that Gladwynne could guess when the City would complete the redesign process, and thus Gladwynne had to remain ready to perform changed and additional work until the final change order was completed in January, 1999.

Although the City continues to maintain that Gladwynne should have finished by May, 1998, the objective evidence is quite simply that Gladwynne could not stop working until the City stopped redesigning. Now as a practical matter, the change order work slackened in Fall, 1998, to the point where Gladwynne was able to take on a replacement job in

November, 1998. But, prior to that time, and through no fault of its own, Gladwynne was working on a contract which was supposed to have expired in February, 1998, and was receiving no additional compensation from the City.

Behrle testified that, because of appellant's bonding capacity, the company could not take on additional work during the delay. The following testimony is relevant:

[APPELLANT'S COUNSEL]: During this delay period from March of '98 to January of '99, were you able to take on work on other projects to absorb these home office costs that you incurred?

[BEHRLE]: No.

[APPELLANT'S COUNSEL]: Why not?

[BEHRLE]: Well, we have a limited bonding capacity. . . . We're bonded. We're a bonded contractor. We put up a bond for each job. In this instance, we put a $500,000.00 bond up, and if we have a two million dollar bonding line, and we've assigned $500,000 of our bonding line to this job, I can't get another $500,000.00 until this one is completed, and that frees up that bonding, just like a line of credit. It's the same thing.

[APPELLANT'S COUNSEL]: But as you get payments from the City, doesn't that increase your bonding capacity?

[BEHRLE]: No. In the bonding company's eyes, it's not over till it's over and you get final payment.

\* \* \*

[APPELLANT'S COUNSEL]: Do the change-orders play any part—strike that. Does the bonding company consider a change-order to be a part of your contract on any given job?

[BEHRLE]: Yes.

\* \* \*

[APPELLANT'S COUNSEL]: Mr. Behrle, what amount, if any, of bonding capacity did you have available to go out and book for [sic] other jobs during this delay period?

[COURT]: It was 200, I mean a two million bonding capacity. He put a half-million dollars on this, is what you said, right?

[BEHRLE]: My capacity was three million.

\* \* \*

[APPELLANT'S COUNSEL]: It is that easy, Mr. Behrle, you now have 2.5 million dollars worth of bonding capacity that you can go out and bid on other jobs?

[BEHRLE]: No. You have to take everything as a whole, and each job speaks for itself. But if I am at, I am at a 3 million dollar capacity, if I have 3 million dollars in contracts, and until I complete the $500,000.00 contract, or $650,000.00 contract, whatever it becomes, then I have a freed up bonding capacity, then I can go out and bid something else.

[COURT]: And you can't bid on another job while you have a half-million dollar job going?

[BEHRLE]: Not if my—

[COURT]: You can only bid one job at a time?

[APPELLANT'S COUNSEL]: No. I have other jobs going, but they total 3 million, and until I complete those jobs and free up bonding, I can't bid anything else. . . .

On cross-examination, Behrle conceded that the appellant's bonding capacity was subsequently increased, but he explained that the increase did not occur until November 1998, towards the end of the Project. Behrle testified:

[APPELLEE'S COUNSEL]: Were you able to successfully obtain any projects, any new projects, from May, '98 till September, '98?

[BEHRLE]: We started a new project in November of '98, so we probably did that in September, is my guess.

[APPELLEE'S COUNSEL]: And how much was that project for?

[BEHRLE]: I think it was for a million dollars.

[APPELLEE'S COUNSEL]: Is the bond rating still three million dollars at that point?

[BEHRLE]: At some point going into '99, I believe we changed bonding companies and got our limit increased to five million. That's why if you look at the financial statements, our billings for '98 were three million; our billings for '99 were five million.

Appellee counters that appellant failed to present evidence as to the third element, *i.e.,* appellant's inability to assume other work during the delay. Thus, the City maintains that Gladwynne failed to meet its burden to satisfy the *Eichleay* criteria. In support of its position, the City contends that "[a] significant portion of the Appellant's alleged damage amount occurred after Gladwynne started work on a replacement project in November 1998." Appellee states, in relevant part:

One of the elements that a plaintiff must prove in order to invoke the use of the Eichleay formula is the inability to take on other work during the suspension, delay, or disruption. Gladwynne was unable to prove this aspect of the test in order for the Eichleay formula to apply. In November 1998 Gladwynne began a one million dollar project for the Corps of Engineers called 28 Units. Just as Gladwynne submitted a bid on the high school in March 1998 (more than six months before the renovation project began), it is reasonable that Gladwynne submitted a bid for a one million dollar project for the federal government six months to a year before that project began.... Therefore, it is reasonable to assume that Gladwynne submitted a bid for the federal project between November 1997 and May 1998.

When an owner causes delay of uncertain duration, or the contractor's bonding capacity is limited, a contractor cannot take on additional work. *Wickham,* 12 F.3d at 1577–78. Even if appellant submitted a bid for another project during its performance of this Project, this would not necessarily establish that appellant was able to take on other work during the period of delay. *See Altmayer,* 79 F.3d at 1134.

Significantly, the City acknowledged responsibility for some of the delay, and thus extended the contract by ninety-one days. The City also recognizes the validity of the *Eichleay*

formula generally. Similarly, the court found a delay of 195 days attributable to the City, although only with respect to field costs, but did not quarrel with the formula itself. In addition, appellant showed that its bonding restrictions were not eased until November 1998, so that it could not take on a new project prior to that date. Therefore, it appears that appellant presented evidence to satisfy the *Eichleay* formula for at least some portion of the total delay. Nevertheless, the court declined to award any delay damages for overhead expenses, on the ground that appellant did not meet all of the elements of *Eichleay;* it failed to identify which element was not satisfied, however.

Because it is not apparent to us why the court determined that the *Eichleay* formula was not applicable for any period of time, we shall vacate the judgment and remand for further proceedings as to overhead delay damages. On remand, the court should reconsider whether the *Eichleay* formula was satisfied, and, if so, for what period of time and at what daily rate.

## II.

 Upon finding a delay of 195 days attributable to the City, the court awarded appellant $66,083.55 in extended field costs. Gladwynne complains, however, that the court erred in finding that the Project was only delayed for 195 days, rather than the 309 days that appellant had claimed for field costs. Using the court's rate of $338.89 per day, it sought damages of $103,361.45, based on 309 days, rather than the $66,083.55 awarded by the court for a delay of 195 days.[9]

---

9. Appellant observes that when the parties settled the direct costs for the change orders, "they reserved the question of how much, if any, delay costs Gladwynne could recover." Gladwynne acknowledges in its reply brief that it has "acquiesced" in the court's "adoption of the general conditions costs contained in Gladwynne's pay estimates as a measure of [its] daily field costs, and appeals only the amount of days awarded."

Appellant asserts that it was delayed by the City at least through December 1998 or January 1999, because "the City redesigned the Project via change orders in an attempt to remedy its defective plans and specifications." According to appellant, "the City continued to issue change orders through December, 1998, and Gladwynne continued to work on those change orders through January, 1999." Therefore, appellant disagrees with the circuit court's determination that the delays attributable to the City only extended appellant's performance through September 11, 1998. Appellant argues:

The evidence adduced at trial clearly showed that the schedule around which the City builds its Brief was, along with the architect's very design, rendered completely meaningless by the eventual recognition that contrary to the architect's drawings, there was no utility crawlspace. That defining event severely impacted all of Gladwynne's original work. Added to this was the fact that during the time that Gladwynne was attempting to surmount the utility problem, the City added 54 change orders for various other reasons.[ ]

To hang one's hat, therefore, upon the failure to meet a meaningless submittal schedule when the very nature of the job has been fundamentally altered is to engage in the worst form of Monday morning quarterbacking. This is particularly true where, as here, the quarterback is the one who misdesigned the Project in the first place.

What Mr. Sider, or for that matter Mr. Weeks and Mr. Cohen, did not do was point to one item of work which Gladwynne could have performed but did not. Mr. Sider admits that he never performed any analysis whatsoever which showed that any days were lost due to delays by Gladwynne.

Furthermore, although Mr. Sider admits that any topic of importance was discussed at progress meetings, it bears repeating that there is not one single mention in any letter to Gladwynne or in any of the progress meeting minutes that Gladwynne was understaffing or was behind schedule. The testimony put forward by the City is innuendo without substance.

Nor did Mr. Sider share any concern about Gladwynne's alleged lateness with Gladwynne. The most that the City can produce is one internal document which was never provided to Gladwynne. The City's silence during the job speaks volumes.

Mr. Weeks, for his part, admits that when he made his after-the-fact assessment that Gladwynne should have been completed by May 30, 1998, he was taking into account work which was neither requested nor performed until at least *September 2, 1998*. Although the City's own witness conclusively established the complete baselessness of the City's position, the City persists in arguing that work which had not yet come into existence should somehow have been completed by May 30, 1998.

Further, Gladwynne contends that "the City raised for the first time at trial allegations of performance problems by Gladwynne and then argued that those generalized grievances somehow coalesced into a concurrent delay on the part of Gladwynne." In its view, "there is absolutely no evidence that any item of work performed by Gladwynne could have been accomplished at an earlier time." Among other things, appellant relies on the following testimony of Behrle:

Well, what happened was, there was no-first off, we got a notice to proceed on September 2nd. We really couldn't start until the end of September because there was asbestos that needed, that was removed by the school or DPW or somebody, but it was not in our contract. So, we had to wait for that.

Once we waited for that, we got on the site and nobody could find the crawl space under [classroom] 29. . . .

\* \* \*

[W]e expended approximately five to six weeks of looking for a crawl space that didn't exist. . . . We're basically at a standstill. There's nothing we can do until we get this resolved.

So, we decided to redesign. It was at some point, around the 13th, it was decided that, hey there is no crawl space.

We need to make another plan.... The problem was, you can't put the blue acid resistant pipe in the trench.... To encase it in concrete, you have to use duriron pipe, which is like a cast iron, but it's acid resistant.

Gladwynne also points out that because the crawlspace did not exist, it had to order a different type of pipe, which did not arrive until January 19, 1998, resulting in a four and a half month delay. Moreover, appellant explains that, "since entire floors were now being trenched, instead of merely receiving two 4 inch penetrations, no other work could be started until the trenches were filled on or about February 18, 1998." Consequently, the work was delayed by another month. Appellant explains:

As a result of the trenching in Room 29, Gladwynne had to flash patch the entire floor prior to installation of the vinyl. Only after that was completed, in early May 1998, could Gladwynne begin to install cabinetry. It took until the middle of July to finish the cabinet installation due to two unforseen asbestos abatements as well as having to stop work while the City mishandled various window leaks. Then, and only then, could Gladwynne measure and place the order for the manufacture of the countertops. Installation of the countertops was completed in mid-August, 1998, at which time Gladwynne was able to install the faucets, electrical devices, gas tops and the pipe chases which the City added midway through the Project. During the time that Gladwynne was accomplishing these original and changed tasks, the City added more electrical change orders.

Further, appellant notes that the estimate of completion contained in the progress meeting notes of May 5, 1998, took into account only eleven of forty-four change orders, of which just six had been completed at that time. Additionally, it claims that the City counted $127,500 of delivered but uninstalled cabinets as completed work. Therefore, Behrle testified that the Project's actual percentage of completion at the time was only 63%.

While urging us to accept the 93% completion figure, the City does not refute that the percentage of completion did not include thirty-three out of forty-four change orders, and did not take into account that $127,000 worth of cabinetry was not yet installed. Nevertheless, the City maintains that appellant should have been able to finish "the remaining 7% of the project over the next three weeks." The City states:

> As it turned out, the Appellant needed from May 5, 1998 to August 11, 1998 to reach 98% completion. It took Gladwynne more than three months to complete five percent of the work. It then took the Appellant another one month to complete the remaining two percent of the work before the substantial completion date.

The City also contends that it was responsible for delays only through May 30, 1998, because by that date Gladwynne "had completed more than 90% of the project and had received from the City $430,400 of the total contract amount of $497,000."

As we indicated, in asserting that the Project was 93% complete by May 5, 1998, the City did not consider the change orders and uninstalled cabinets. Moreover, the City does not explain why, given those omissions, the Project was really 93% completed. Even if only 7% of the Project remained to be completed by that time, however, the City gives no explanation as to why appellant could have been finished in three weeks. For example, if appellant were awaiting the delivery of the duriron pipes, as was the case earlier in the Project, it could not necessarily have finished the work within three weeks. Without knowing what remained to be finished and its status, the fact that only 7% of the work had to be completed does not mean that it necessarily could have been accomplished in a discrete period of time.

The City presented conclusory testimony that appellant's work progressed too slowly and inefficiently. For example, the architect, Sider, said that appellant's work "seemed slow"; "[i]t just seemed to always be behind;" appellant was "always running late;" and Gladwynne's "performance on this project"

was "very frustrating." Yet, Sider was primarily on the job just for the progress meetings. Similarly, Weeks indicated that "Gladwynne was not prosecuting the work as diligently as they should," although he only had been to the job site a few times. In much the same way, Cohen, a person with a background in education, not construction, testified generally that the work was done in "fits and starts" and that "it was all hurry up and wait." Appellant, on the other hand, presented factual evidence indicating that change orders were still being issued as late as December 1998. Clearly, appellant could not have completed the Project while change orders were still forthcoming.

It appears to us that appellee has tacitly acknowledged in its brief that, at least through November 1998, the delay was not attributable to appellant. Instead, the City seems to challenge appellant's effort to recover through December 1998 or January 1999. We quote from the City's brief:

Even now, Gladwynne is achieving to be paid for a period of time from September 11, 1998 to December 31, 1998. Counsel for the appellant has written that "the undisputed evidence was that Gladwynne remained on the job through January 1999. . . ." However, Mr. Behrle testified that the renovation work at the high school was approximately finished in November 1998. He added that he was replacing the project at the high school in November 1998. Gladwynne's superintendent was not at the job site for the high school on a full time basis in November 1998. The trial court reasonably found that Gladwynne should not receive any damages for this period after September 11, 1998, the date the parties agree that substantial completion of the project occurred. As Mr. Sider testified, he only went to the site on two occasions after the punch list inspection and substantial completion in September 1998.

\* \* \*

Gladwynne is attempting to obtain damages from November 1998 to January 1999 for a period of time when no one from the company regularly worked on the project at the high school. Punch list items were being worked on by the

Appellant as of September 11, 1998 when the project was substantially completed.

As we noted, the court found that appellant was entitled to recover extended field costs due to delays occasioned by the City, but only for 195 days, representing the period from February 28, 1998, to September 11, 1998. We conclude that the court erred in limiting the period of delay for which field costs were compensable to the period from February 28, 1998 to September 11, 1998. Therefore, we shall vacate the court's judgment and remand for further proceedings as to the length of delay for which appellant is entitled to compensation for extended field costs.

### III.

Appellant contends that the circuit court erred in deducting the Contract balance of $25,753 from its award of damages, based on the court's conclusion that appellant did not complete the punch list to the satisfaction of the School. Appellant advances several grounds to support its contention. First, appellant asserts that the judge "impermissibly delegated his decision-making duties to Principal Cohen." Second, appellant argues that the "deduction was tied to performance which was not requested by the City." Third, appellant contends that the items on the punch list were not within the scope of work under the Contract. Fourth, appellant claims that "[t]here is no evidence to support the deduction."

As appellant puts it, in "one of the more bizarre turns in this case," the court "arm twisted" appellant to perform the punch list work "as a precondition to receiving the contract balance monies." Appellant adds that, "in effect [the court] ordered specific performance," although no such request was made by the City. Gladwynne also asserts that the judge improperly "relinquished his own role" and instead appointed a person whom he knew to blame Gladwynne for the Project's late completion and who successfully got Gladwynne removed from bidding lists for future City work. Principal Cohen, a non-jurist, was made sole arbiter of

Gladwynne's performance and hence its ability to receive its contract balance. [The court] provided Principal Cohen with no guidance whatsoever and placed neither restraint nor requirement of impartiality upon him.

\* \* \*

[The court] made Principal Cohen's happiness the barometer of Gladwynne's success, and in so doing gave Principal Cohen free reign to resolve his long-festering dispute with Gladwynne. Further, [the court] neither allowed dissent nor expressed any interest in whether or not the items of work were within the scope of Gladwynne's contract. Contrary to the principles of fair play and impartiality which are the underpinnings of American jurisprudence, [the court] abandoned Gladwynne to its enemy.

According to the City, appellant "failed to complete the punch list work," and therefore it was "reasonable for the City to apply the retainage amount in order to complete the work." The City asserts that, in ruling that the City was entitled to the retainage under the Contract, the "court clearly did not accept the proffer by Gladwynne's counsel that less than $2000 of work remained to be performed on the punch list." Appellee adds that appellant "put forth no evidence that the cost to perform the work would not be the entire amount of the retainage." Further, appellee maintains that, after listening to the earlier testimony of Behrle, who was appellant's primary witness, the court regarded him as unworthy of belief, and it was the court's responsibility to judge the credibility of the witnesses. In its brief, the City has not addressed appellant's claims that the trial court improperly delegated its judicial responsibilities. Nor did it respond to the assertion that the court below erred in linking the payment of the Contract balance to the punch list, even though no such remedy was requested by the City.

Page GC–21 of the Contract provides that "five percent (5%) shall be retained until final payment is made." Retainage often provides an owner with a source of funds "to complete the job if the contractor should default." *Ridge*

*Sheet Metal Co., Inc. v. Morrell,* 69 Md.App. 364, 376, 517 A.2d 1133 (1986). Here, Weeks testified that the retainage was held by the City in the event of a delay in completion. The Contract also provided for liquidated damages, but the City has not referred us to any legal authority to support its position that the retainage constituted a liquidated damage provision.

The court clearly linked recovery of the Contract balance to the performance of a punch list prepared solely by appellee. But, at the relevant time, appellant did not lodge an objection. Although the court seems to have cast the completion of the punch list as a *quid pro quo* to appellant's recovery, we know of no reason why able counsel could not have asserted an objection. Appellant's failure to do so amounts to a waiver of that aspect of its contention.

Nevertheless, we conclude that, on this record, the court erred in finding that appellant failed to complete the punch list items. We explain.

In essence, the gist of appellant's claim is a challenge to the court's reliance on the City's proffer. In light of the conflicting positions of the parties as to whether appellant satisfactorily completed the punch list, we believe the court erred by resolving the dispute on the basis of credibility determinations regarding conflicting proffers, without affording either side the opportunity for cross-examination.

The City seems to suggest that the court did not have to credit appellant's proffer, because it had already decided that Behrle was unworthy of belief. In effect, the City contends that, on the basis of its proffer, the court was entitled to decide that appellant had not fully performed. The City has not referred us to any authority to support its position that the finder of fact can close his mind to evidence on unresolved issues on the basis of earlier assessments as to the credibility of a witness.

*Barnes v. State,* 31 Md.App. 25, 354 A.2d 499 (1976), provides guidance. There, the trial court had before it conflicting evidence, offered by way of stipulation, pertinent to a shoplift-

ing charge pending against the defendant. Depending on which stipulation was found credible, the evidence could have supported either a conviction or an acquittal. The trial court resolved the conflict by accepting the State's version of events, although no live testimony was presented for either side. On appeal, the Barnes Court acknowledged that it is the function of the trier of fact to resolve evidentiary conflicts. *Id.* at 34, 354 A.2d 499. The Court noted, however, that "when evidence is offered by way of stipulation, there is no agreement as to the facts...." *Id.* at 35, 354 A.2d 499. Rather, "a stipulation only goes to the content of the testimony of a particular witness if he were to appear and testify. The agreement is to what the evidence will be, not to what the facts are." *Id.* Writing for the Barnes Court, Judge Orth observed that, when conflicting evidence is presented by stipulation, "there must be some basis on which to judge the credibility of the witness whose testimony is the subject of the stipulation, or to ascertain the reliability of that testimony, to the end that the evidence obtained by stipulation may be weighed against other relevant evidence adduced." *Id.* at 35, 354 A.2d 499.

In rejecting as "capricious" the trial court's "arbitrary choice" to accept the State's stipulation rather than the defense's, *Barnes*, 31 Md.App. at 34, 354 A.2d 499, the Court reasoned: "The rub here is that, in the circumstances, there was no proper basis on which the court could resolve the conflict....Neither witness from whom the evidence emanated appeared before the court; the court was merely told what the witnesses would say if they testified." *Id.*

Moreover, Gladwynne's attorney complained that he did not have an opportunity to cross-examine the City's witnesses. The importance of cross-examination was eloquently elucidated in *Somerset v. Montgomery County Bd. of Appeals,* 245 Md. 52, 225 A.2d 294 (1966):

"[T]he more liberal the practice * * * the more imperative the obligation to preserve the essential rules of evidence by which rights are asserted or defended * * * All parties must be fully apprised of the evidence submitted or to be considered, and must be given the opportunity to cross-

> examine witnesses * * * In no other way can a party maintain its rights or make its defense." The right of a party to call hostile witnesses as its own after the testimony of the adverse party has been completed, in our opinion, is not the substantial equivalent of the right to cross-examine immediately after the direct testimony of the witness has been concluded. The techniques of advocacy so essential to our system of justice are largely stultified when resort must be had to such a cumbersome and delayed substitute for immediate and direct cross-examination.

*Id.* at 66, 225 A.2d 294 (citation and footnote omitted).

In this case, the court accepted the veracity and accuracy of the City's proffer, and squarely rejected appellant's countervailing proffer. It is one thing to reject the testimony of a person who appears and testifies; it is quite another to choose one proffer over another when the witnesses have not appeared and the parties have not been afforded an opportunity to challenge the proffer through cross-examination. In crediting the City's proffer without affording appellant the opportunity to challenge it through cross-examination, or to call its own witnesses, the circuit court erred. On the record presented, the court could not determine whether the punch list work was adequately completed. Accordingly, on remand, the court should resolve the issue on the basis of admissible evidence.

## IV.

 In its cross-appeal, the City contends that the trial judge erred in awarding any damages to appellant. Appellee asserts that "[t]here is absolutely no basis for the Appellant's claim for delay damages." A contractor cannot recover "where the delays are 'concurrent or intertwined' and the contractor has not met its burden of separating its delays from those chargeable to the [City]." *Blinderman Constr. Co. v. United States*, 695 F.2d 552, 559 (Fed.Cir.1982). Appellee asserts that the burden of separating the "submittal delays in comparison with [the] construction schedule" was on the appellant, and appellant failed to meet that burden. In other

words, appellee asserts that both parties contributed to the delay, and appellant had the burden to apportion the delay and expense attributable to each party. The City adds:

> In the instant case it is clear that the trial court did not resolve the contractor's delay in the project correctly. A concurrent delay by Gladwynne meant that the company had to separate its delay from the government's delay. There was no such separation of which party was responsible or what portion of the delay.

* * *

> The burden is on the Appellant to show the separate delays and damages caused by the City. This burden was not met by the Appellant; therefore, it was incorrect for damages to be awarded based on the record.

Gladwynne responds that:

(a) the City did not even argue, let alone establish, that one item of work could have been performed at an earlier date, (b) the City issued Change Orders through December, 1998, and (c) the documents which the City alleges were submitted in an untimely fashion by Gladwynne were no longer required due to the missing utility crawlspace, and thus no delay could possibly have resulted.

The Judge's comment that Gladwynne did not have enough people to do the job does not reflect a finding that the City presented substantial evidence of concurrent delay. Had [the trial judge] so ruled, it would have been reversible error. The only evidence presented by the City was in the form of witnesses who said, in essence, that they thought that Gladwynne should have had more men, and that there were periods of inactivity. That was all.

The City presented absolutely no evidence as to when the inactivity, or lack of manpower, occurred, or what work was available. Gladwynne, for its part, freely admitted that it was inactive when, for instance, the utility problem, or the owner's abatement of asbestos, or the owner's failure to stop leaking windows near the cabinetry, prevented it from working. Indeed, the crux of Gladwynne's complaint was

that the city through incompetent design and redesign forced its contractor into sustained periods of inactivity or unproductivity. And it bears repeating that while the City found much fault after Gladwynne brought suit; there was not one mention of Gladwynne having insufficient forces or areas of available work which were not being prosecuted during the Project.

We are satisfied that the decision of the lower court was supported by sufficient evidence. Indeed, appellant presented the lower court with ample evidence of separate and distinct causes of the contract delays attributable to the City. These causes included change orders issued by the City, as well as the missing crawlspace. Given this evidence, we see no reason to reject the lower court's decision to award damages to appellant.

## V.

 Appellee argues that appellant failed to comply with various provisions of the Contract, including a provision involving a condition precedent requiring the Director of Public Works to have the opportunity to attempt to resolve the dispute before the filing of suit. Appellee states:

The contract between the City and Appellant clearly requires arbitration as a means of resolving any disputes that may arise over the course of the contract. The contract states that the Contractor's submission of the dispute to the Director of Public Works is a condition precedent to the right of the Contractor to receive any monies under the contract.

Appellee adds:

The contract clearly contemplated that the Director would have a substantial role in resolving disputes prior to litigation. Indeed, the director's ability to resolve the dispute was a condition precedent to litigation.

The City claims, however, that Gladwynne merely sent the Director a letter dated October 5, 1999, stating: "This letter

will be our last attempt to resolve this matter prior to litigation."

We begin our analysis with reference to the relevant provisions in the Contract.

The Contract states, in part:

A. Subject to the power and authority of the Director of Public Works as provided by law and in these contract documents, the Engineer with the approval of the Head, Bureau of General Services, shall in all cases determine the amount or quantity, quality and acceptability of the work and materials which are to be paid for under this contract; shall decide all questions in relation to said work and the performance thereof; and shall in all cases decide questions which may arise relative to the fulfillment of the contract or to the obligations of the Contractor thereunder.

B. To prevent disputes and litigation, the Director of Public Works will be the referee in case any question shall arise between the Contractor and the City touching the contract, and his determination, decision, and/or estimate shall be final and conclusive upon the Contractor, and shall also be a condition precedent to the right of the Contractor to receive any monies under the contract.

In our view, the City's claim has been waived. We explain.

In *RTKL Associates, Inc. v. Four Villages Limited. Partnership*, 95 Md.App. 135, 620 A.2d 351, *cert. denied*, 331 Md. 87, 626 A.2d 371 (1993), we found a waiver of condition precedent based upon a delay in electing arbitration, active participation in discovery, and the filing of a motion for summary judgment by a party seeking to invoke the issue of condition precedent. The same fact pattern appears in the case at bar.

The issue of the condition precedent was not brought to the trial court's attention until the first day of trial, when the City moved to dismiss, or, in the alternative, to stay the proceed-

ings. That motion was denied. The City never moved to compel arbitration, however. *See Joseph F. Trionfo & Sons, Inc. v. Ernest B. LaRosa & Sons, Inc.*, 38 Md.App. 598, 381 A.2d 727, *cert. denied*, 282 Md. 734 (1978); Md.Code (1974, 1998 Repl.Vol.), § 3–201 *et seq.* of Courts & Judicial Proceedings Article. We are satisfied that, by answering appellant's complaint, filing a counterclaim, and participating in discovery, the City waived the condition precedent, including the alleged arbitration rights it might have had under the Contract.[10]

It is also noteworthy that Weeks considered Gladwynne's claim. Certainly, the City had knowledge of the terms of its own Contract. In selecting the manner in which Gladwynne's claim would be considered, the City waived any contention that the claim should have been pursued differently.

Furthermore, the basic purpose of the "arbitration" clause was accomplished. The City appointed Weeks to address the claim and subsequently acquiesced in his decision to make partial payment to Gladwynne. As appellant observes, it submitted its claim to the Director and the Engineer, as well as the Head of the Bureau of Public Works. The City later paid $104,422 to appellant, after consideration of its claim.

Accordingly, this claim lacks merit.

---

**10.** Appellant disputes that the contract required arbitration, stating:
 [T]he City's position is completely unsupported by the contract.
 It is not clear exactly what the contract calls for in terms of dispute resolution. It does not call for hearings or require submission of the documents which Mr. Scragging demanded. Although it requires both the Engineer and the director to resolve "questions," it does not call for an "appeal" from one to the other.
 While the contract states that the Director's determination shall be a condition precedent to the Contractor's right to receive money, it does not, as the City alleges, say that this process is a condition precedent to litigation.
 * * *
 Whatever the contract contemplated, it was not arbitration. Although the City points to a provision of the City Charter which says that contracts *may* contain arbitration clauses, this particular contract did not so provide.
 We need not resolve this contention, based on our finding of waiver.

JUDGMENT OF THE CIRCUIT COURT FOR BALTI-
MORE CITY VACATED; CASE REMANDED TO THAT
COURT FOR FURTHER PROCEEDINGS CONSISTENT
WITH THIS OPINION. COSTS TO BE PAID BY APPEL-
LEE.