958 A.2d 402

**In re DAMIEN F. & Terrell F.**

**In re Christian D. & Jenna J.**

**Nos. 320, Sept. Term, 2008, 322, Sept. Term, 2008.**

Court of Special Appeals of Maryland.

Oct. 7, 2008.

550

Nenutzka C. Villamar (Nancy S. Forster, Public Defender, on brief), for Appellant.

Leslie K. Ridgway (Carl N. Zacarias, Douglas F. Gansler, Atty. Gen., on brief), Melissa S. Rock (Legal Aid Bureau, on brief), Riverdale, for Appellee.

Panel: DAVIS, WOODWARD, SHARER, and J. FREDERICK (retired, specially assigned), JJ.

DAVIS, J.

Appeal No. 320 arises from a shelter care hearing held in the Circuit Court for Montgomery County. The juvenile petition, filed by the Montgomery County Department of Social Services (the Department), alleged that nineteen-month-old Damien F. and six-year-old Terrell F. were "neglected and/or disabled" and requested that they be placed outside their parents' care under a shelter care order. After a hearing in which the parties submitted only their respective proffers, the juvenile court found the facts as alleged in the petition and granted an emergency shelter care order to the Department. The mother, Ms. H., appeals from the juvenile court's grant of the emergency shelter care order.

In Appeal No. 322, the Montgomery County Department of Health and Mental Hygiene (the Department)[1] filed a petition in the Circuit Court for Montgomery County, alleging that Christian D. and Jenna J. were Children In Need of Assistance (CINA) and requested that the court grant an order of shelter care directing that Christian and Jenna be removed from their parents' care and temporarily placed with another

---

1. Because the two agencies acted in pari materia in their roles in the respective proceedings, the Departments of Social Services and Health and Mental Hygiene will both be referred to interchangeably as "the Department."

caretaker. At a shelter care hearing held on April 3, 2008 in the Circuit Court for Montgomery County, sitting as the Juvenile Court, the court granted the Department's request for shelter care and the children were placed with their maternal grandmother. After the appeal was noted from the shelter care decision, the children were found to be CINAs. The mother of the children, Jennifer B., filed a notice of appeal of the CINA disposition, but soon thereafter voluntarily dismissed the appeal. Ms. B. appeals the grant of the emergency order for shelter care, seeking to demonstrate that she should have been permitted to present witness testimony to. challenge the allegations in the Department's CINA petition.

In both Appeal No. 320 and Appeal No. 322, the mother of Damien F. and Terrell F. (Ms. H.) and the mother of Christian D. and Jenna J. (Ms. B.) and the father of Jenna J. present for our consideration the same question, which we quote: Where a parent requested an evidentiary hearing on the Department's request for shelter care, did the juvenile court err in requiring the parties to proceed by way of proffer?

In Appeal Nos. 320 and 322, the Department presents the following questions for our review:

1.  Should an appeal from a shelter care order be dismissed where the appellant has conceded the mootness of the legal issue on appeal?

2.  Did the circuit court act within its discretion when ordering two children to be placed in emergency shelter care when their parents proffered no evidence that specifically disputed the allegations of abuse relied upon by the court?

In Appeal No. 322, the Department presents the following additional question for our review:

Did the Circuit Court act within its discretion in proceeding by proffer in an emergency shelter care hearing when the mother would have the opportunity to present evidence the forthcoming adjudication hearing?

## FACTUAL BACKGROUND

### Appeal No. 320

Damien F. and Terrell F. were removed from the home on March 19, 2008. The juvenile court held a shelter care hearing the next day. At the beginning of the hearing, the juvenile court stated that it would only hear proffers from both parties. Counsel for Ms. H objected, explaining that she had witnesses who would contradict the Department's allegations. The juvenile court responded that counsel would not be permitted to call witnesses. The following ensued:

[COUNSEL FOR Ms. H]: My client doesn't believe that the children should be sheltered. I do have a number of witnesses that I would like to call. Sharnissa H., as well as Shelly H.

THE COURT: You won't be calling any witnesses. I'll be taking proffers.

[COUNSEL FOR Ms. H]: Okay.

THE COURT: I don't know what the other judges do, but that's what I do. And it's been on appeal. And I've not been reversed. So that's what I do.

[COUNSEL FOR MS. H.]: Well, Your Honor, just for the record—

THE COURT: Sure.

[COUNSEL FOR Ms. H]: I am going to say that this is a hearing. It's a shelter care hearing. I think that we have the right to put on witnesses so that Your Honor can judge the credibility. And we would ask that we'd be allowed to do so since—

THE COURT: Thank you. My position has been, remains, that this is an emergency kind of hearing and that I take the petition of the Department as their proffer to which they may add by proffer, and then I will accept proffers from each party through their counsel. And my, how shall I say, comment to that from the point of view of the Department is that a proffer is even more advantageous to a party

than live testimony, which may be contracted,[2] may be the subject of cross-examination.

It's almost the best viewed, the best faced [sic], the best version that a party can put on which his or her counsel is able to make a representation to the court and make a proffer to the Court. So I don't have any discomfort with doing that.

Because it's an emergency hearing—and you can tell me what those witnesses would say. So, because it's an emergency, that's the way I'll proceed, and I'll note your disagreement with my view.

So what I'm planning to do here is read the petition of the Department, hear if there are other proffers by counsel for the child, and then hear if there are other proffers by counsel for the mom. And then I'll hear you on whether a shelter care order should be entered based upon everything I've heard.

### The Department's Allegations

The Department's proffer was the information in its petitions in support of its request to place the children in shelter care. It proffered that the children had been neglected and that Ms. H. was unwilling or unable to give proper care and attention to the children and their needs. In support of its conclusions, the Department submitted the following:

On March 12, 2008, Child Welfare Services (CWS) received a report that the children were left home alone while Ms. H. went to the store. On March 19, CWS conducted an unannounced home visit and found Ms. H. home with the children. Terrell was not wearing diapers, had dirt on his face and neck and had sticky hands. His hair was not combed and "was littered with white debris." Damien's clothing was ripped and "very dirty." The home was "in disarray" and "infested with cockroaches." Staff members observed "a plethora of ciga-

---

2. We presume that the juvenile court said "contradicted" and that it was inaccurately transcribed.

rette butts in the home as well as empty liquor bottles." The petitions further alleged that "there was no food or milk in the refrigerator, little frozen food in the freezer and no food in the pantry." While the social worker was in the home, the nineteen-month-old was playing with wires behind the TV, and the six-year-old was banging his head on a broken baby swing. CWS staff noted that Ms. H. "presented as under the influence of substances, evidenced by slurred speech, acting non-responsive, and was unable to find clothing and shoes for her children."

### *Ms H.'s Proffer*

Ms. H. proffered the testimony of Sharnisa H., the mother's sister. Sharnisa would have testified that she went to the family's apartment shortly after the Department removed the children. She observed that the house was clean. There was "ample" food in the refrigerator and pantry, such that she was able to eat a sandwich and chips. There was also a chicken defrosting in the sink. Furthermore, Sharnissa would have testified that she did not see even one roach in the apartment. Sharnisa would have testified that the mother never told her or other relatives that she drank excessive milk or hid urine in order to produce a negative urinalysis result.

Ms. H. would have denied the allegations in the CINA petition. Specifically, she denied that there were "wires" behind her television or that Damien was playing with wires. She also denied that Terrell was banging his head against the swing. Ms. H. would have contradicted the allegation that she was under the influence of any substances, as the Department alleged. She would have attributed any extraordinary reactions, such as slurred speech, to experiencing shock at the notion that the Department was going to take her children away from her. Ms. H. would have admitted to having used marijuana occasionally, but would have denied that she has ever used PCP. Furthermore, she would have testified that there were no drugs in her apartment. Ms. H. would have

testified that she was able to find clothing and shoes for the children.

Ms. H. would have denied having hidden another person's urine sample in her clothes in order to falsify her own drug test and, in fact, could not have done that because there was always someone present with her when she submitted to urinalysis.

Ms. H. also proffered the testimony of Shelly H., whom she had known for many years. Shelly's relationship with the family was that she took care of Damien for a brief period following a tragic incident involving Damien's father. Shelly would have testified that she has been to the family home and has observed Ms. H. with Damien and Terrell. She never saw any reason to be concerned for the children's safety and would have called child welfare services if she had seen any of the behaviors that the Department was alleging.

Both Sharnisa and Shelly would have testified that Ms. H. did not tell them or other relatives that she drank excessive milk or hid urine in order to produce a negative urinalysis result.

### The Court's Ruling

In granting an order of shelter care, the court concluded:
... Based on the proffers made by all three parties and the arguments, I find that the home conditions were filthy and the children were dirty and inappropriately dressed.
That there was a[n] alleged history of drug abuse by the mother. That the children were allegedly left at home alone by-this is family members found them alone at home is what I should say. And it's not possible to return them because it's against their-it's contrary to the welfare of the children to do so because of the home condition and because the mother may be using illicit drugs, of reasonable efforts are not possible to eliminate the need for removal because of the emergency nature of the children's situation.

### Appeal No. 322

On April 2, 2008, the Department removed Christian D. and Jenna J. from their mother's care pursuant to the emergency

shelter care order. The Department filed a CINA petition on April 3, 2008, as to Christian D. and Jenna J. requesting that they continue to be committed to the Department under a shelter care order for thirty days pending the adjudication hearing. At the shelter care hearing, counsel for Ms. B. requested that she be allowed to present the testimony of two witnesses. The following transpired:

THE COURT: All right. Let me ask any persons who are not court personnel and who are not here for the case of Jenna J. and the case of Christian D. to please step outside, and we'll retrieve you when your particular cases are called. Are all these persons involved with the case?

[COUNSEL FOR MS. B.]: They are, Your Honor.

[MS. B.]: No, they are not parties, but they are witnesses.

\* \* \*

THE COURT: Well as [sic] the rule on witnesses? I mean, is there going to be?

[COUNSEL FOR THE DEPARTMENT]: Well, I'm going to object to any witnesses being called. I think Ms. Wolfson and Mr. Cooney can certainly proffer, but they are not parties to this case and should be not be present for the hearing.

THE COURT: All right. *Well, are you contemplating, holding an evidentiary hearing?*

[COUNSEL FOR M S. B.]: *If the Court would permit it, I would like to have them testify, two of the people testify.*

THE COURT: *Well, I'll hear proffers.*

[COUNSEL FOR THE DEPARTMENT]: *Okay, well for purposes of the record I need to object to that.*

\* \* \*

THE COURT: Okay. Well, my construction of the statute is that members of the general public are excluded. *And I consider persons who are involved in the case either as support or potential witnesses if this were an evidentiary*

*hearing to be not in that category.* So, I'll allow them to remain.

\* \* \*

THE COURT: And let me do the first thing I'll do is read the petition. Is there any other evidence besides the petition that you are proffering, Ms. Schultz?

[COUNSEL FOR THE DEPARTMENT]: No, I do have just one minor correction to the petition.

(Emphasis added).

### *The Department's Proffer*

The Department proffered the contents of the CINA petition, which alleged as follows: The Department received a report on March 3, 2008 that Ms. B. was neglecting four-year-old Christian and six-month-old Jenna. The reporter stated that Ms. B. had a history of mental health issues and was an alcoholic, which rendered her unable to provide for the care and safety of the children. During an interview of Christian on March 21, 2008 by a social worker from the Department, he reported that he gets nothing to eat during the day and that he "gets a beating so hard" that he cries whenever he does something bad. He also said that his mother cursed at him, drank beer and threatened to kill Jenna's father, Ricky J. Christian also claimed that his father pushed him into a television stand. According to the petition, Christian was afraid that his mother would hurt him. When she was interviewed, Ms. B. admitted drinking alcohol and hitting Christian.

When the social worker met with Ms. B. and Ricky J. on March 31, both parents denied that the father had pushed Christian into the television stand. Ms. B. signed a safety plan proposed by the Department, which required her to have a mental health evaluation, to follow all treatment recommendations and to provide urine samples. The petition further alleged that the social worker observed that Ms. B. was "very sarcastic," and had commented, "Right, so it's not okay for me to kick my son?" Ms. B. subsequently completed a substance

abuse evaluation and was found to be ineligible for services. She refused the referral for mental health treatment.

On April 2, 2008, in a second report of neglect of Christian by his mother, the reporter alleged that Ms. B. had threatened family members that they would never see Christian again. Ms. B. called the maternal grandmother and asked her to pick Christian up because she was "throwing him out." According to the reporter, one hour later, Mr. J. called the maternal grandmother and asked her to pick up Christian because Ms. B. had been drinking in a bar and was acting strangely. Christian was outside without a shirt or shoes when the grandmother went to the house. The grandmother reported that Christian was outside alone, shaking and crying with no shirt or shoes on. Christian's mother had thrown his clothes out in the rain.

According to the Department, family members said that Ms. B. has a history of violent behavior and unpredictable moods and that the she has a history of psychiatric hospitalizations, including a stay at the Regional Institute for Children and Adolescents as a teenager. Family members also described an incident in which Ms. B. once threw a telephone out of her apartment window. The Department removed Jenna from Ms. B.'s custody on April 2nd. The police who assisted in Jenna's removal, according to the Department, told Ms. B. to prepare formula for Jenna and she refused.

In an interview, Christian's father, Dexton D., told the social worker that Ms. B. was "crazy" and has "two personalities." He allegedly also said that Ms. B. has a drinking problem. He was unable to attend the shelter care hearing because he had to work, but he wanted Christian to be in his grandmother's care because she will allow him to visit with Christian; Ms. B. does not.

### Ms. B.'s Proffer

The first witness proffered by Ms. B. was Lauren Harper of the Montgomery County Coalition for the Homeless. She had been assisting Ms. B. for the past two months, visiting her

every week. She would have testified that Ms. B. is a really good mother and she has never noticed any problems in the home. The children are very bonded with their mother. Ms. B. is extremely cooperative and, among the numerous services in place for her, are in-home parenting classes by the organization Families Foremost. Ms. B. had vouchers for the children to attend all-day daycare. No one at the daycare ever saw any indication of abuse or neglect of the children and, according to Harper, the children seemed to have been well taken care of.

The second witness would have been Ms. McNeil, a worker with the Greentree Shelter. During the few months that she has been working with Ms. B, McNeil saw her with her children at the Greentree Shelter "all the time." McNeil would have testified that Ms. B. is "a great mom" and that she has never had any concerns about the way she takes care of the children. Additionally, Ms. B. was completely cooperative with McNeil in following through with services, including attempting to become employed.

Ms. B. would have also testified, denying the allegations in the CINA petition. She would have admitted that she does not permit Christian to see his father because he is a convicted and registered sex offender. She would have further testified that Christian's grandparents on numerous other occasions have attempted to obtain custody of him.

### The Proffer of Jenna's Father

Counsel for Ms. B. proffered that Jenna's father, Ricky J., would have testified that he has never seen Ms. B. abuse or neglect her children. In his opinion, Ms. B. provides good care to Jenna. He admitted that he called the maternal grandmother to pick up Christian, but he denied making any disparaging remarks about Ms. B. He would have testified that an ongoing feud between Ms. B. and the maternal grandmother is at the root of the allegations against Ms. B.

### The Court's Ruling

The court ruled as follows:

Well, as the parties well know, this is something akin to a probable cause determination, it's not a conclusive finding that I make. I have to look at the allegations in the CINA petition, hear the proffer from any parties opposing and determine whether I think there is a probability that some of this conduct may have occurred which would necessitate me sheltering the child.

I've reviewed the petition and there are several allegations which are of concern to me which have not been denied, including a remark made by the mother, allegedly, that in response to the CWS staff suggesting that she has been kicking her son. The allegation in paragraph (f), *that's previously been referenced which has not been denied,* is that when the grandmother went to the home, found Christian standing outside of the home without any shirt or shoes. There are other suggestions of her violence that has been going and personality problems with the mother that cause her to act in an erratic manner.

So, I do think at this point of the proceeding, which is not a final determination, that it would be contrary to the children's welfare to return them to the family home at this time for the reasons I've stated. I find an emergency situation is presented by virtue of this alleged conduct.

(Emphasis added).

Although the court's response to counsel's request to produce live testimony was "I'll hear proffers," it did cite in its ruling that the charge that Ms. B. had kicked Christian was not denied by either parent in their proffers. Finding "reasonable grounds to believe these events took place," the court also cited the allegation that Christian was kicked out of the home and the other allegations of erratic behavior by Ms. B. The court then ordered that the children be placed in the care of their maternal grandparents, with Ms. B. having weekly supervised visitation. A pre-trial hearing was scheduled for April 24, 2008. On April 9, 2008, Ms. B. noted an appeal of the shelter care order.

## The Parties' Contentions

Appellants assert that the juvenile court erred in refusing to hold an evidentiary hearing and in not permitting witnesses to testify. They argue that the statutory scheme established by the legislature clearly anticipates an evidentiary hearing. By proceeding by way of proffer, they assert, the court had no way of judging the credibility of the witnesses and no way of determining the reliability of the evidence.

Appellants recognize that this issue is moot as it relates to the shelter care hearing of March 20, 2008 because there was an adjudication and disposition hearing on April 10, 2008, as to Damien F. and Terrell F. and, on May 1, 2008, as to Christian D. and Jenna J., at which time the children were declared to be CINA. They argue, nevertheless, that the issue should be decided b y this Court because shelter hearings "evade appellate review due to the inherent time constraints in CINA cases," which require the juvenile court to hold an adjudication hearing within thirty days of the shelter care hearing.

Appellants aver that, "[b]ecause parenting is a fundamental right, and an order of shelter care deprives a parent of that fundamental right even if only temporarily, this case presents an issue that is of public concern." They assert that, "[g]iven the stakes involved compared with the high risk of an erroneous deprivation, even if temporary, due to the nature of the hearing, this Court should clarify whether conflicting proffers is a sufficient basis for deciding whether to place a child in shelter care."

The Department has moved to dismiss both appeals "as moot because [appellants] had an opportunity to present witness testimony at the adjudication hearing" and, as to Appeal No. 320, the State avers that Ms. H's subsequent stipulations to the facts alleged in the CINA petition constitutes acquiescence to the shelter care order.[3]

---

3. The Department's brief notes that two identical petitions were filed in Appeal No. 320 and states that it will refer to both petitions when it uses the singular.

The Department further asserts that the juvenile court acted within its discretion when proceeding by proffer because appellants would have had the opportunity to present witnesses within thirty days of the shelter hearing.

## DISCUSSION

### I

### A

### Statutory Rights At Shelter Hearing

Although the Department asserts that appellant bases her argument on procedural due process, in our view, appellant's argument is primarily based on the statutory scheme set out in the Maryland Code and Rules of Court.

Shelter care is governed by Md.Code, Cts. & Jud. Proc., § 3–815 (C.J.), which provides, in pertinent part:

(b) A local department may place a child in emergency shelter care before a hearing if:

(1) Placement is required to protect the child from serious immediate danger;

(2) There is no parent, guardian, custodian, relative, or other person able to provide supervision; and

(3)(i) 1.   The child's continued placement in the child's home is contrary to the welfare of the child; and

2.   Because of an alleged emergency situation, removal from the home is reasonable under the circumstances to provide for the safety of the child; or

(ii) 1.   Reasonable efforts have been made but have been unsuccessful in preventing or eliminating the need for removal from the child's home; and

2.   As appropriate, reasonable efforts are being made to return the child to the child's home.

(c)(1) Whenever a child is not returned to the child's parent, guardian, or custodian, the local department shall immediately file a petition to authorize continued shelter care.

(2)(i) The court shall hold a shelter care hearing on the petition before disposition to determine whether the temporary placement of the child outside of the home is warranted.

(ii) Unless extended on good cause shown, a shelter care hearing shall be held not later than the next day on which the circuit court is in session.

(3) If the child's parents, guardian, custodian, or relatives can be located, reasonable notice, oral or written, stating the time, place, and purpose of the shelter care hearing shall be given.

(4) A court may not order shelter care for more than 30 days except that shelter care may be extended for up to an additional 30 days if the court finds after a hearing held as part of an adjudication that continued shelter care is needed to provide for the safety of the child.

(5) Unless good cause is shown, a court shall give priority to the child's relatives over nonrelatives when ordering shelter care for a child.

(d) A court may continue shelter care beyond emergency shelter care only if the court finds that:

(1) Return of the child to the child's home is contrary to the safety and welfare of the child; and

(2)(i) Removal of the child from the child's home is necessary due to an alleged emergency situation and in order to provide for the safety of the child; or

(ii) Reasonable efforts were made but were unsuccessful in preventing or eliminating the need for removal of the child from the home.

(e)(1) If the court continues shelter care on the basis of an alleged emergency, the court shall assess whether the absence of efforts to prevent removal was reasonable.

(2) If the court finds that the absence of efforts to prevent removal was not reasonable, the court shall make a written determination so stating.

(3) The court shall make a written determination as to whether reasonable efforts are being made to make it

possible to return the child to the child's home or whether the absence of such efforts is reasonable.

Maryland Rule 11–112 provides,

**a. Emergency Detention or Shelter Care.**

1. Authority. The court or an intake officer may authorize emergency detention or shelter care of a child taken into custody in accordance with Section 3–815(b) of the Courts Article.

2. Report to Court—Petition for continued detention or shelter care. If a child is placed in emergency detention or shelter care, the intake officer shall, on the next day the court is sitting:

(i) report that fact to the court, together with the circumstances that led to the child being placed in emergency detention or shelter care; and

(ii) if continued detention or shelter care is sought, file a petition for continued detention or shelter care showing cause why continued detention or shelter care is warranted.

3. Hearing. If a petition for continued detention or shelter care is filed pursuant to this Rule, a hearing shall be held on the day the petition is filed and the respondent shall be brought to court for the hearing. The hearing may be postponed or continued by the court for good cause shown, but it may not be postponed for more than eight days following the commencement of respondent's emergency detention or shelter care. Reasonable notice of the date and time of the hearing shall be given to the respondent, and if possible to his parent and his counsel, if known.

**b. Continued Detention or Shelter Care Pending Adjudication or Waiver.**

1. Finding. Detention or shelter care may not be continued beyond emergency detention or shelter care unless after a hearing the court finds that one or more of the circumstances stated in Section 3–815(b) of the Courts Article exists.

2. Maximum Period of Detention or Shelter Care. Continued detention or shelter care pending the adjudicatory or

waiver hearing may not be ordered for a period of more than thirty days.

**c. Continued detention or shelter care after waiver or adjudicatory hearing.** The court may, on petition or on its own motion, continue detention or shelter care for a period not longer than thirty days after a denial of a petition for waiver or an adjudicatory hearing.

**d. Title 5 not applicable.** Title 5 of these rules does not apply to detention or shelter care hearings.

There is no question that the Department was required to request a hearing and that the juvenile court was required to hold one. The question is whether the court was required to permit Ms. H and Ms. B., as the parents of the sheltered children, to present witnesses at that hearing to prove their case and whether they had a right to cross-examine the Department's witnesses to contradict its case.

### B

### Statutory Construction

The rules of statutory construction are clear. "Our primary purpose, in interpreting a statute, is always 'to discern the legislative purpose, the ends to be accomplished, or the evils to be remedied by a particular provision.'" *Ishola v. State,* 404 Md. 155, 160, 945 A.2d 1273 (2008) (citation omitted). "In order to ascertain the intent of the Legislature, we begin with the plain language of the statute, and if that language is clear and unambiguous, we look no further than the text of the statute." *Id.* (citation omitted). "Although the plain language of the statute guides our understanding of legislative intent, we do not read the language in a vacuum." *Cain v. State,* 386 Md. 320, 327, 872 A.2d 681 (2005) (citations omitted). "When construing a statutory provision within a single statutory scheme, we must consider the statutory scheme as a whole to determine the legislative intent." *In re Mark M.,* 365 Md. 687, 711, 782 A.2d 332 (2001). "'[I]t is presumed that the General Assembly acted with full knowledge of prior legislation and intended statutes that affect the

same subject matter to blend into a consistent and harmonious body of law.'" *Pete v. State,* 384 Md. 47, 65, 862 A.2d 419 (2004) (citation omitted).

The purposes of the statutes relating to children in need of assistance are set out in C.J., § 3–802. **Purposes and construction of subtitle.**

(a) Purposes. The purposes of this subtitle are:

(1) To provide for the care, protection, safety, and mental and physical development of any child coming within the provisions of this subtitle;

(2) To provide for a program of services and treatment consistent with the child's best interests and the promotion of the public interest;

(3) To conserve and strengthen the child's family ties and to separate a child from the child's parents only when necessary for the child's welfare;

(4) To hold parents of children found to be in need of assistance responsible for remedying the circumstances that required the court's intervention;

(5) Except as otherwise provided by law, to hold the local department responsible for providing services to assist the parents with remedying the circumstances that required the court's intervention;

(6) If necessary to remove a child from the child's home, to secure for the child custody, care, and discipline as nearly as possible equivalent to that which the child's parents should have given;

(7) To achieve a timely, permanent placement for the child consistent with the child's best interests; and

(8) To provide judicial procedures for carrying out the provisions of this subtitle.

"The best interests of the child standard embraces a strong presumption that the child's best interests are served by maintaining parental rights." *In re Yve S.,* 373 Md. 551, 571, 819 A.2d 1030 (2003) (citation omitted). The presumption is "a well established principle of Maryland law" and "the

presumption exists, until rebutted, that it is in the child's best interest to be placed with a parent." *Id.* at 572, 819 A.2d at 1042–43. This Court has recognized the drastic nature of removing a child from the custody of his or her parents. In *In re Jertrude O.*, 56 Md.App. 83, 466 A.2d 885 (1983), we noted that "[t]he Legislature and the Supreme Court have both expressed the view that children should not be uprooted from their family but for the most urgent reasons." *Id.* at 99, 466 A.2d 885. Indeed, a "more stringent" standard of proof is required to deny a parent custody than to declare a child a CINA. *In re Joseph G.*, 94 Md.App. 343, 350, 617 A.2d 1086 (1993). "[D]epriving a parent of custody of a child is a drastic measure that should only be taken when necessary for the welfare of the child." *Id.* (citations omitted).

In recognition of the fundamental nature of parental rights, C.J., § 3–813 provides that a parent is entitled to counsel at every stage of the proceedings under this subtitle and to representation by the Public Defender's Office if he or she cannot afford a private attorney. That section provides, in pertinent part:

### § 3–813. Right to counsel

(a) *In general.* Except as provided in subsections (b) and (c) of this section, a party is entitled to the assistance of counsel at every stage of any proceeding under this subtitle.

(b) *Eligible parties.* Except for the local department and the child who is the subject of the petition, a party is not entitled to the assistance of counsel at State expense unless the party is:

(1) Indigent; or

(2) Otherwise not represented and:

(i) Under the age of 18 years; or

(ii) Incompetent by reason of mental disability.

(c) *Representation by Office of the Public Defender.* The Office of the Public Defender may not represent a party in a CINA proceeding unless the party:

(1) Is the parent or guardian of the alleged CINA;

(2) Applies to the Office of the Public Defender requesting legal representation by the Public Defender in the proceeding; and

(3) Is financially eligible for the services of the Public Defender.

Further, as noted above, when the Department removes a child from his or her home, both C.J., § 3–815(c)(2)(i) and Md. Rule 11–112(a)(2) require that a hearing be held on the next day that the court is in session. Both § 3–813(c)(3) and Rule 11–112(a)(3) require that reasonable notice of the date and time of the hearing is to be given to the child's parents if they can be found. The summons advises a parent of his or her right to counsel and instructs the parent on how to subpoena a witness if he or she does not want a lawyer. Appendix to the Maryland Rules, Form 912–N, "Notice Of Emergency Detention/Shelter Care And Notice Of Hearing"; Appendix to the Maryland Rules, Form 904–R/WS, a request for a witness subpoena.

These provisions indicate that the legislature intended that the parent of a sheltered child be present and participate in the proceeding. Our conclusion is buttressed by this Court's decision in *In re McNeil,* 21 Md.App. 484, 320 A.2d 57 (1974). In that case, the juvenile court denied a continuance to allow the presence at the hearing of a mother who had filed a Petition For Review Of Commitment of her children to the Department of Social Services. *Id.* at 486, 320 A.2d 57. The reason for her absence was that one of the children who were the subjects of the petition was ill. *Id.* at 487, 320 A.2d 57. We held that the juvenile court had erred in denying the continuance:

We can think of no right more fundamental to any parent than to be given a reasonable opportunity to be present at

any judicial proceeding where the issue is whether or not the parent should be permitted to have custody of its child. We believe that there was grave and serious error on the part of the trial judge in compelling the hearing to proceed in the absence of the Appellant, and we find that it was arbitrary and unreasonable for him to refuse to grant a continuance so that she might be present.

The Maryland General Assembly has clearly expressed its recognition of the principle that the primary right to rear and nurture a child rests in its parents and not in the State, and it is only under the most extraordinary circumstances that a parent may be divested of that right and custody of a child placed in the hands of others. Article 26, Section 70(4), now Courts Art. Section 3–802(a)(5), states that one of the purposes of the special legal provisions relating to juvenile causes is "(t)o separate a child from his parents *only when necessary for his welfare or in the interest of public safety.*"

*In Matter of Wooten,* 13 Md.App. 521, 528, 284 A.2d 32 (1971), we indicated that the special concerns expressed in our juvenile law were not merely meaningless, high sounding phrases. We reiterate that view.

*Id.* at 496–97, 320 A.2d 57 (internal footnote omitted) (emphasis added).

We continued:

While recognizing the reluctance of the court to grant a last minute continuance when duly summonsed witnesses have properly responded to a summons, we believe it so obvious as not to require discussion that the right of a parent to be present at a hearing involving the custody of her child must be given precedence over minor inconvenience to lesser involved persons. A myopic insistence upon expeditiousness in the face of a justifiable request for delay can render the right to due process an empty formality.

It may very well be, as Judge Hammerman found, that the best interest of these children required that they be separated from the Appellant and placed in another environment, but the Appellant was entitled to a reasonable oppor-

tunity to be present and assert her view as to why her children should be returned to her care. *Since we find that she was denied that reasonable opportunity to be heard, this case must be remanded for a new hearing.*

*Id.* at 499–500, 320 A.2d 57 (emphasis added; internal citations omitted).

The importance of the parents' participation was also recognized in *In re Maria P.*, 393 Md. 661, 904 A.2d 432 (2006). In that case, Petitioner, the child's mother, was excluded from the courtroom during the child's testimony at the adjudication hearing because the Department feared that Petitioner's presence would cause the child to "shade" her testimony. *Id.* at 670–71, 904 A.2d 432. The Court of Appeals noted: "Petitioner is a parent and party to the action, with a fundamental interest in the care and welfare of her child." *Id.* at 676, 904 A.2d 432. The Court concluded that "the juvenile court abused its discretion in excluding Petitioner from the proceedings without making any specific factual findings as to the propriety of her exclusion." *Id.* at 679, 904 A.2d 432. Although the Court noted that, under Md. Rule 5–615(b)(1), "a party who is a natural person" is excluded from the rule permitting exclusion of witness, its decision was broadly based:

[I]t is clear that the right [to be present for and to participate in the trial of one's case] emanates ... from the common law of Maryland, from the due process clause of the Fourteenth Amendment to the U.S. Constitution, from the Maryland equivalent of that clause, Article 24 of the Declaration of Rights, and from Article 19 of the Declaration of Rights.

*Id.* at 677–78, 904 A.2d 432 (quoting *Green v. North Arundel Hosp. Ass'n, Inc.*, 366 Md. 597, 618, 785 A.2d 361 (2001)) –. (alteration and ellipses present in *Maria P.*). The Court further stated that, "[d]espite the informal nature of proceedings in juvenile court ... standards of fairness must be observed." *Id.* at 677, 904 A.2d 432 (citation and internal quotations omitted).

The fact that the legislature has seen fit to provide that a parent is entitled to counsel at every stage of the proceeding

also indicates that a parent may do more than simply proffer. It is unlikely that the legislature provided the right to counsel if it did not intend that counsel participate in the proceedings. Although counsel in this case was permitted to proffer and to sum up the evidence, it was clear that the juvenile court considered the proffer to be insignificant because counsel adopted the conclusions of the Department as set forth in its petition. In fact, the trial court noted that the proffer was "even more advantageous to a party than live testimony" which "may be the subject of cross-examination." Although appellant was unable to cross-examine the Department's witnesses, the trial court's statement foreshadowed that the procedure the trial court would follow would be to accept the unchallenged Department's proffer as true.

In *Barnes v. State,* 31 Md.App. 25, 354 A.2d 499 (1976), Barnes was charged with shoplifting and the trial proceeded pursuant to a not guilty plea and an agreed statement of facts. *Id.* at 26, 354 A.2d 499. The prosecutor proffered what the State's witness would say, after which defense counsel moved for a judgment of acquittal. *Id.* at 27–28, 30, 354 A.2d 499. At that point, defense counsel proffered Barnes' testimony, which was in conflict with the State's testimony. *Id.* The trial court found Barnes guilty, and she appealed. *Id.* at 33, 354 A.2d 499. We reversed the trial court and explained:

As we have indicated, it is the function of the trier of fact in such a situation to resolve evidentiary conflicts. In performing this function, it may believe one witness and disbelieve another, for the credibility of the witnesses and the weight to be given the evidence are matters for it. The rub here is that, in the circumstances, there was no proper basis on which the court could resolve the conflict. Certainly, neither the State's evidence nor the defense's evidence was inherently incredible. Neither witness from whom the evidence emanated appeared before the court; the court was merely told what the witnesses would say if they testified. There were simply no factors apparent from the record before us which would enable the court to judge the credi-

bility of either witness, or the reliability of the evidence offered through them. The court expressed no reasons for the finding inherent in its verdict and gave no clue as to why it concluded, in the face of the conflicting evidence, the [sic] Barnes concealed the merchandise. As we see it, in the circumstances, the only way the court could have resolved the conflict in the evidence, and made a factual finding that the merchandise was concealed, was by arbitrary choice. We believe a choice so made to be capricious, and a determination of guilt beyond a reasonable doubt may not be properly bottomed on it. Therefore, the judgment of the court on the evidence was clearly erroneous, and we shall reverse it.

*Id.* at 34–35, 354 A.2d 499.

In *Taylor v. State,* 388 Md. 385, 879 A.2d 1074 (2005), Taylor was tried for rape upon an "Agreed Statement of Facts." *Id.* at 393, 879 A.2d 1074. The first part of the statement was a recitation of the facts reported by the victim, Ms. Carter and the second portion which was captioned, "Additional Facts." *Id.* The latter portion of the document stated that, two days after the incident, Taylor, who had been living in a group home, told three of his counselors that he was not returning to the group home and that "he forcibly prevented [Carter] from leaving and that he had sex with her." *Id.* 394, 879 A.2d 1074. The document also reported appellant's statement that Carter had agreed to have sex with him. *Id.* At trial, the document was the only evidence presented. *Id.* The trial court found Taylor guilty of second-degree assault, but not guilty of the remaining charges based on the averment that Taylor pushed Carter to the bed and upon defense counsel's conceding the issue. *Id.* at 395, 879 A.2d 1074. After his conviction, Taylor appealed, complaining *inter alia* that "the trial court erred in convicting him based on an agreed statement of facts that left material facts in dispute." *Id.*

Citing *Barnes,* the Court of Appeals reiterated the impossibility of making factual determinations when there is conflicting evidence:

Although this Court has not, until now, had a case so close in point to *Barnes*, we have, as noted, quoted and cited *Barnes* with approval on several occasions. In *Atkinson v. State*, 331 Md. 199, 203, 627 A.2d 1019 (1993), we made clear that, although the procedure of having all of the evidence presented through stipulation may be appropriate "when the parties sought to argue solely legal issues at trial," it "should not be used when there are significant witness credibility questions." We add now, not just that the process "should not be used" when there are material disputes of fact that hinge on credibility determinations, but that it *may not* be used in that circumstance. The *Barnes* [C]ourt was correct in its observation that, where (1) material evidence is in conflict, (2) resolution of that conflict depends on a determination of the credibility of the witnesses through whom the conflicting evidence is presented, and (3) there are no factors apparent in the record that would enable a finder of fact reliably to judge the credibility of the witnesses, any determination made by the trier of fact is necessarily arbitrary and cannot stand.

*Id.* at 398–99, 879 A.2d 1074.

Although the Department asserts that *Taylor* and *Barnes* are distinguishable because they are criminal cases, the principle here is the same. The only way the juvenile court could have made a factual finding was by arbitrarily choosing which evidence to believe.

This Court applied the same principle in *Wells v. Wells*, 168 Md.App. 382, 896 A.2d 1082 (2006). In that case, Husband had obtained a divorce and other relief from the court by default after Wife had failed to respond to any of the court's notices or to appear at any hearing. *Id.* at 385, 896 A.2d 1082. Upon learning of the divorce, Wife moved to vacate the judgments. *Id.* at 389, 896 A.2d 1082. She averred that Husband, with whom she was still living at the time the divorce was granted, had intercepted her mail from the court and had obtained the divorce and other relief by fraud. *Id.* at

389–90, 896 A.2d 1082. Husband denied the allegations and averred that Wife knew of the litigation and received all of the mail from the court, but ignored it. *Id.* at 390, 896 A.2d 1082. The trial court denied Wife's motion to vacate without providing her an evidentiary hearing on her allegations. *Id.* at 391, 896 A.2d 1082. This Court held that the trial court had abused its discretion in denying the Wife's motion to vacate the default judgment with respect to all issues except the divorce itself and by denying the Wife's motion to vacate the default judgment with respect to the divorce without holding an evidentiary hearing on the Wife's allegations of fraud. *Id.* at 396, 896 A.2d 1082. The Court explained:

> The affidavits of the parties thus were diametrically opposed, on their faces.
>
> Only a credibility assessment, largely demeanor-based, could resolve the conflict as to whether the judgment of divorce was obtained by fraud. In that circumstance, it was impossible for the court to fairly assess the allegation of fraud without holding an evidentiary hearing.

*Id.* at 399, 896 A.2d 1082 (citing *Taylor,* 388 Md. at 398–99, 879 A.2d 1074). This Court made the same point in *Gladwynne Constr. Co. v. Mayor and City Council of Baltimore,* 147 Md.App. 149, 807 A.2d 1141 (2002), another non-criminal case. There, the trial court had permitted one of the City's witnesses to proffer what work remained to be done on a renovation contract. *Id.* at 168, 807 A.2d 1141. The Court explained:

> In essence, the gist of appellant's claim is a challenge to the court's reliance on the City's proffer. In light of the conflicting positions of the parties as to whether appellant satisfactorily completed the punch list, we believe the court erred by resolving the dispute on the basis of credibility determinations regarding conflicting proffers, without affording either side the opportunity for cross-examination.

*Id.* at 192, 807 A.2d 1141.

The Court also noted that Gladwynne's attorney complained that he did not have an opportunity to cross-examine the City's witnesses and added:

In this case, the court accepted the veracity and accuracy of the City's proffer, and squarely rejected appellant's countervailing proffer. It is one thing to reject the testimony of a person who appears and testifies; *it is quite another to choose one proffer over another when the witnesses have not appeared and the parties have not been afforded an opportunity to challenge the profer through cross-examination.* In crediting the City's proffer without affording appellant the opportunity to challenge it through cross-examination, or to call its own witnesses, the circuit court erred.

*Id.* at 194, 807 A.2d 1141 (emphasis added).

■ Again, in this case as well, appellant was not permitted to cross-examine the Department's witnesses to test their credibility and to test the veracity of their conclusions. This is especially significant in cases like Appeal No. 320 in which many of the allegations are by unnamed reporters and the Department's petition is devoid of any information from which the trial court could determine the credibility of the reporter. Although the court cited unrebutted allegations of abuse in Appeal No. 322, the decision not to hear from witnesses was made before counsel was afforded an opportunity to present proffered testimony. Although the statute expressly notes that the rules of evidence set forth in Title 5 are not applicable in shelter hearings, that does not mean that the court may accept any evidence proffered without regard to its reliability. The Court of Appeals discussed the reliability requirements in *In re Billy W.,* 387 Md. 405, 875 A.2d 734 (2005), a case involving a permanency planning hearing. After noting other situations in this State and others in which the rules of evidence were not strictly applied, the Court concluded that, in such cases, "the trial court must evaluate whether evidence proffered for admission is sufficiently reliable and probative prior to its admission." *Id.* at 434, 875 A.2d 734.

■ We also disagree with the Department's assertion that the trial court has discretion to accept proffers at the shelter care hearing because a full adversarial hearing is anticipated within thirty days. The State's interest in protect-

ing the safety of a child does permit a temporary infringement of a parent's right to physical custody of his or her child, but that interest is protected by permitting the Department to take custody of the child prior to the shelter hearing.[4] Further, the issue here is not whether the State may protect the child, but what protection the legislature has given the parent and child against an unwarranted removal of the child. The trial court referred to the hearing as an emergency hearing; however, there was no reason not to permit cross-examination of the Department's witness or not to permit appellant's witnesses to testify. Although the Department apparently believes that a thirty-day period of separation is insignificant for a parent and child, the legislature clearly thought otherwise.

Second, there is no indication that the juvenile court exercised any discretion. The Department recognizes that it may be advisable to hear witnesses or permit cross-examination in some cases, but the juvenile court apparently accepts only proffers in all shelter hearings.

In *Holmes v. State*, 333 Md. 652, 658–59, 637 A.2d 113 (1994), the Court of Appeals reversed Holmes' convictions because the trial court had not permitted him to make a closing argument. The Court noted:

Some cases may appear to the trial judge to be simple-open and shut-at the close of the evidence. And surely in many such cases a closing argument will, in the words of Mr. Justice Jackson, be "likely to leave [a] judge just where it found him." But just as surely, there will be cases where closing argument may correct a premature misjudgment and avoid an otherwise erroneous verdict. And there is no

4. In *In re Kimberly H.*, 242 A.D.2d 35, 40, 673 N.Y.S.2d 96 (N.Y. App. Div. 1998), cited by the Department, the court's decision that new-born Kimberly should not remain in the custody of her mother was based on the result of a fact-finding hearing shortly before Kimberly's birth after which the Family Court had concluded that Kimberly's siblings were at imminent risk of harm and should be removed from their home. Thus, Kimberly's mother had been afforded an opportunity to establish that Kimberly would be safe in her custody.

certain way for a trial judge to identify accurately which cases these will be, until the judge has heard the closing summation of counsel.

*Holmes,* 333 Md. at 658, 637 A.2d 113 (quoting *Herring v. New York,* 422 U.S. 853, 863, 95 S.Ct. 2550, 45 L.Ed.2d 593 (1975) (citation omitted)). By analogy, there may be cases where cross-examination and witness testimony may change the juvenile court's view on whether removal of a child from his or her home is warranted. The juvenile court cannot determine in which cases removal of a child is warranted until it has allowed the parent to present his or her case.

Other sections of the Maryland Code make clear the preference for evidentiary hearings. For example, Md.Code (2006 Repl.Vol., 2007 Supp.), Fam. Law (F.L.), § 4–504.1(b) permits a commissioner to issue an interim protective order to protect an individual from domestic violence. F.L., § 4–504.1(d)(1)(i) provides that the order "shall state the date, time, and location for the temporary protective order hearing and a tentative date, time, and location for a final protective order hearing." F.L., § 4–504.1(d)(1)(ii) provides that "[a] temporary protective order hearing shall be held on the first or second day on which a District Court judge is sitting after issuance of the interim protective order, unless the judge continues the hearing for good cause." F.L., § 4–505, dealing with temporary protective orders, allows a trial court to enter a temporary protective order "after a hearing on a petition, whether ex parte or otherwise." By contrast, nothing in the Courts Article indicates that the legislature expects a shelter hearing to be *ex parte.* In addition, F.L., §§ 4–505(a)(1) and (2) subsection (c) provides that the temporary protective order "shall be effective for not more than 7 days after service of the order."

The Rule regarding temporary restraining orders is also illustrative. Md. Rule 15–504(a) permits a court to grant a temporary restraining order "only if it clearly appears from specific facts shown by affidavit or other statement under oath that immediate, substantial, and irreparable harm will result to the person seeking the order before a full adversary

hearing can be held on the propriety of a preliminary or final injunction." Section (f) of the rule provides:

A party or person affected by the order may apply for modification or dissolution of the order on two days' notice to the party who obtained the temporary restraining order, or on such shorter notice as the court may prescribe. The court shall proceed to hear and determine the application at the earliest possible time. The party who obtained the temporary restraining order has the burden of showing that it should be continued.

Notwithstanding the "interim" character of an emergency shelter care hearing and the Department's assertion that the issue is moot, it is inconceivable that removal of a child from his or her parent can be viewed as less important than criminal and domestic procedures. Clearly, the legislature intended that a person deprived of his or her rights be afforded an evidentiary hearing at the earliest possible time. In view of the legislature's recognition of the importance of the parent-child relationship, it clearly did not intend that a parent or child would be required to wait thirty days before being afforded an opportunity to challenge the deprivation.

## II

Notwithstanding our determination that a hearing within the purview of C.J., § 3–815(c)(2)(i) and Md. Rule 11–112(a)(2) contemplates that one faced with the removal of his or her child from the home is entitled to adduce testimonial evidence to contest the allegations in the petition for an order for emergency shelter care, we recognize that the strictest "requirements of procedural due process may not be applicable when the necessity for summary action in an emergency situation to protect the public health and safety is clear." *Hebron Savings Bank v. City of Salisbury*, 259 Md. 294, 300, 269 A.2d 597 (1970). Accordingly, we are duty bound to strike a balance between the State's compelling interest to do all that it can to protect children from child abuse and neglect, *Prince George's County Department of Social Services v. Knight*, 158

Md.App. 130, 854 A.2d 907 (2004), while at the same time recognizing the fundamental right of a parent to raise his or her child. *Santosky v. Kramer*, 455 U.S. 745, 759, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). We have agreed with appellant's assertions, *supra*, that, "because parenting is a fundamental right, an order of shelter care deprives a parent of that fundamental right even if only temporarily." We also have made clear that we believe, as appellants have urged in this appeal, that, due to the nature of shelter care hearings and the consequences flowing therefrom, *i.e.*, temporary deprivation of the right to parent one's child, that the instant appeals "present an issue that is of public concern." We also agree with appellants' framing of the issue as "whether conflicting proffers is a sufficient basis for deciding whether to place a child in shelter care."

In Appeal No. 320, Ms. H. contends that the material issues in dispute were "whether [Ms. H.] had a drug problem, whether the children were being properly cared for, whether the house was unsanitary, and generally, whether [Ms. H.] was neglectful."

At the commencement of the shelter care hearing, when counsel for Ms. H. told the court that her client did not believe that the children should be sheltered and that she wished to call Sharnissa H. and Shelly H. as witnesses, the court replied, "You won't be calling any witnesses. I'll be taking proffers." When counsel then protested, "I think we have a right to put on witnesses so that your honor can judge the credibility," the court indicated that, because the shelter care hearings were conducted on an emergency basis, it would "take the petition of the Department as their proffer ... and then ... accept proffers from each party through their counsel." The court then, curiously, commented that, "from the point of view of the Department, ... a proffer is even more advantageous to a party than live testimony, which may be contradicted ... may be the subject of cross-examination." Further characterizing proffers, the judge said, "It's almost the best viewed, the best faced, the best version that a party can put on which his or her counsel is able to make a representation to the court and

make a proffer to the Court. So I don't have any discomfort with doing that." Continuing to reiterate the emergency nature of the hearing on two more occasions, the court commented: "You can tell me what those witnesses would say" and "I'll note your disagreement with my view." The court then announced that it would "read the petition of the Department, hear if there are other proffers by counsel for the child, and then hear if there are other proffers by counsel for the mom." Finally, the court indicated it would hear argument from counsel as to whether a shelter care order should issue.

From the above, it is evident that the court's announced procedure did not contemplate that it would exercise its discretion in deciding whether to grant counsel's request to allow witnesses to testify. Many of the allegations in the Department's petition in Appeal No. 320 are devoid of any information from which the trial court could determine the credibility of persons upon whose reports allegations of child abuse were based. Notwithstanding that C.J. § 3–815 expressly notes that the rules of evidence set forth in Title 5 are not applicable in shelter care hearings, assessing the reliability of the witnesses is quintessential when credibility is at issue. In refusing to exercise its discretion to allow testimonial evidence, the juvenile court erred.

In Appeal No. 322, Ms. B. contends that the lower court lacked the factual basis to warrant placing Christian and Jenna in shelter care because most of the Department's information came from an unnamed reporter, presumably the maternal grandmother, who was allegedly involved in an ongoing feud with Ms. B. and thus had a motive to fabricate the allegations. Lauren Harper of the Montgomery County Coalition for the Homeless, the first witness proffered by Ms. B., would have testified generally that Ms. B. bonded with her children, was extremely cooperative and that no one at the daycare center ever saw any indication of the abuse or neglect of her children. She would have testified to the numerous services available for any home parenting classes and confirmed that Ms. B. had vouchers for the children to attend all-

day daycare. Ms. McNeil, a worker with the Greentree Shelter, would have similarly testified that Ms. B. is a "great mom" and that Christian's grandparents have attempted to obtain custody of him. The proffer for Jenna's father, Ricky J., was that he would have testified that he has never seen Ms. B. abuse or neglect her children, that she provided good care to Jenna and that there was an ongoing feud between Ms. B. and the maternal grandmother which he believed prompted the allegations against Ms. B.

The material allegations contained in the Department's petition were that the Department received a report, on March 3, 2008, that Ms. B. had a history of mental health issues and was an alcoholic who was neglecting her four-year-old and six-month-old children. In an interview on March 21, 2008, Christian reported to a social worker, that he gets nothing to eat during the day and that he sustains severe beatings from his mother, who cursed at him, drank beer and threatened to kill Jenna's father, Ricky J. Ms. B. admitted drinking and hitting Christian. Ms. B. telephoned the grandmother on April 2, 2008 and asked her to pick Christian up because she was "throwing him out." One hour later, Mr. J. also called the grandmother and asked that she pick Christian up, reporting that Ms. B. had been drinking in a bar and was acting strangely. The grandmother reported that Christian was outside alone, shaking and crying, with no shirt or shoes on. It was also reported that Ms. B. had a history of psychiatric hospitalizations and, on one occasion, threw a telephone out of her apartment window.

Neither the testimony of Lauren Harper nor Ms. McNeil, if presented, would have contradicted or refuted the allegations of abuse. The only proffered testimony which refuted the allegations contained in the Department's petition was that of Jenna's father, Ricky J., whose proffered testimony was that the maternal grandmother was involved in a feud with Ms. B. and thus had a motive to fabricate the allegations. Ricky J.'s proffered testimony, however, did not counter that of Christian's graphic depiction of the beatings that his mother had

inflicted on him and the account of how Ms. B. had turned him out in the rain without a shirt or shoes.

As in Appeal No. 320, counsel for Ms. B. in Appeal No. 322 requested that she be allowed to have witnesses testify, whereupon the Department objected to the presentation of live testimony. The court refused the request to allow testimony and directed that the parties proceed by way of proffers. When it was pointed out that Ms. B. and Mr. J. denied the allegations in the petition, the court responded that it would "accept [Ms. B.'s] denial and again, same as I said, this is a probable cause determination and there are some serious allegations made here and I think it gives rise to, at the very least, a reasonable grounds to believe these events took place." "At this stage in the preceding," the court concluded, "I am going to shelter the children as I have stated." Presented with the facts as set forth in the Department's petition in Appeal No. 322, the court should have allowed counsel to elicit testimony as to those matters that were in dispute. The more serious error was that the court, in its analogy of the shelter care hearing to a probable cause determination—where only one side presents its case—misconstrued the nature of a shelter care hearing and thereby failed to properly exercise its discretion by not considering whether the allegations were disputed. In doing so, the court erred.

## CONCLUSION

The Circuit Court for Montgomery County, sitting as the Juvenile Court in these consolidated appeals, improperly failed to exercise its discretion in issuing orders for emergency shelter care pursuant to C.J. § 8–315. We set forth the following procedures to facilitate resolving the "conflicting proffers" in an efficacious manner. When presented with a request by counsel for the parent or parents to be allowed to present witnesses at a shelter care hearing, as a threshold matter, the court should ask counsel to denote the allegations asserted to be in dispute. The judge should make an initial determination as to whether the competing versions of behav-

ior or events, *viz a viz*, the proffered testimony versus the allegations in the petition, are in dispute.

We hold that, unless the disputed allegation is probatively inconsequential to a determination of whether placement is required to protect a child from serious immediate danger or that removal from the home is necessary to provide for the safety and welfare of the child, the court must receive testimony as to the material, disputed allegations and a denial of the request to produce witnesses, in that instance, is an abuse of discretion.[5]

Commendably, the Montgomery Department of Health and Human Services acknowledges that live testimony should, in some circumstances, be allowed:

It is not the position of the Department that under no circumstances may witness testimony be heard in shelter care hearings. Rather, as the proceeding discussion will show, the decision whether to hear witness testimony lies within the court's discretion, and that in this case [Appellant] was given an opportunity to be heard suitable to the occasion. Admittedly, the individual circumstances in a given case may call for the court to exercise its discretion to hear witness testimony. For example, when the parties dispute the substance of a critical witness's testimony, it may be prudent to hear briefly from that witness. In addition, when the credibility of the Department's allegations is challenged, as is the case here, it may be advisable to hear briefly from the Department's key witness to con-

---

5. We note in passing that the one witness who usually has peculiar knowledge of the facts underlying the disputed allegations is the parent who requests an evidentiary hearing in the shelter care proceeding. When such parent, after requesting an evidentiary hearing, then fails to take the witness stand and testify, the trial court may infer that the testimony not produced would have been unfavorable. *DiLeo v. Nugent*, 88 Md.App. 59, 69, 592 A.2d 1126 (1991) ("When a party in a civil case refuses to take the stand to testify as to facts peculiarly within his knowledge, the [ ] trial court or jury may infer that the *testimony* not produced would have been unfavorable."), *cert. granted*, 325 Md. 18, 599 A.2d 90 (1991), *dismissing appeal after oral argument*, 327 Md. 627, 612 A.2d 257 (1992).

firm that he or she is credible enough to warrant continued shelter care pending adjudication. Ultimately, however, any decision in this regard, when viewed in its context, should be left to the shelter care court's considered discretion.

(Department's Brief, footnote 4 at page 10).

The principal point of departure between the procedure recommended by the Department and our articulation of the proper procedure to be followed is the omission of any mention of cross-examination and the assigning of the ultimate decision to the *unbridled* discretion of the shelter care court.

Apparently, in consideration of the burgeoning number of proceedings in domestic courts throughout the State and the fact that, in many cases, a number of social workers may have provided services to a particular client, the Department suggests "that it be prudent to hear briefly from a [critical] witness." The testimony should be precise and to the point, but the court should proceed no differently in the examination of a witness who is deemed to be critical in controverting the Department's allegations than a witness in any other proceeding. To be sure, the court, in any proceeding, may insist on the relevancy of the proposed testimony of a witness. The only limitation that the court should impose in a shelter care hearing is that only testimony of witnesses *which directly contradicts the allegation of abuse* may be offered.

Finally, because a shelter care hearing is an emergency proceeding and not a preliminary hearing or other proceeding in which counsel may gather information in preparation for a subsequent proceeding, a proponent may not seek discovery in conjunction with an emergency shelter care hearing.

Under our decision today, in Appeal No. 320 of the September Term, 2008, the court erred in its initial determination that its discretion as to whether a witness should be allowed to testify was unlimited and it further erred in its determination that the proffered testimony was not in conflict with the Department's allegations.

In Appeal No. 322 of the September Term, 2008, the testimony of Ms. Harper and Ms. McNeil was essentially in the nature of character evidence and did not contradict the allegations of abuse, other than the negative attestation that they had never seen Ms. B. abuse her children. The court's refusal to allow them to testify would not have been error had that decision been the result of a proper exercise of discretion. Although only inferentially, Mr. J.'s proffered testimony, on the other hand, potentially impeached the maternal grandmother as the person who reported the allegations of abuse against Ms. B. The court erred in refusing to allow his testimony. The more serious error was the court's initial failure to recognize the mother's right to challenge the credibility of her accusers and, accordingly, to exercise the proper discretion in determining which allegations should be subjected to that crucible.

Given the thirty-day period within which there must be a CINA adjudication imposed by C.J. 3–815 and Rule 11–112(b)(2), we recognize that the victory in establishing the right to controvert the allegations of child abuse through live witnesses in a shelter care hearing may prove to be pyrrhic, if that right is denied at the hearing. We have every confidence, however, that shelter care proceedings may proceed as expeditiously in the limited instances where live testimony is required to resolve issues of credibility and that judges presiding over such proceedings will properly exercise their discretion to ensure that parents who face the specter of immediate and summary deprivation of their parental rights, and alleged abused children, alike, are accorded the procedure delineated herein in determining the necessity for this most extraordinary—but often unavoidable—measure.

**IN APPEAL NO. 320, THE EMERGENCY SHELTER CARE ORDER, HAVING BEEN COUNTERMANDED BY THE CINA ADJUDICATION OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY, SITTING AS THE JUVENILE COURT, THE CASE IS REMANDED TO THAT COURT WITH DIRECTIONS TO DISMISS AS MOOT;**

COSTS TO BE PAID BY THE APPELLANT.

IN APPEAL NO. 322, THE EMERGENCY SHELTER CARE ORDER, HAVING BEEN COUNTERMANDED BY THE CINA ADJUDICATION OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY, SITTING AS THE JUVENILE COURT, THE CASE IS REMANDED TO THAT COURT WITH DIRECTIONS TO DISMISS AS MOOT; COSTS TO BE PAID BY THE APPELLANT.